**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Danielle Nicole PACKER, Appellant**

**No. 114 MAP 2016**

Supreme Court of Pennsylvania.

ARGUED: May 10, 2017
DECIDED: August 22, 2017

David R. Crowley, Esq., Deborah Lux, Esq., Centre County Public Defender's Office, for Packer, Danielle Nicole, Appellant.

Crystal Lynn Hundt, Esq.; Stacy Parks Miller, Esq., Michael Matthew Osterberg, Esq., Centre County District Attorney's Office, for Commonwealth of Pennsylvania, Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE DONOHUE

With the emergence of the use of new, powerful and immediate intoxicants, we granted allowance of appeal to reaffirm long established distinctions between ordinary recklessness and malice in the context of a death or serious bodily injury caused by driving under the influence of alcohol and/or a controlled substance. In the case before us, Matthew Snyder was killed in an automobile collision caused by Danielle Nicole Packer, who inhaled (or "huffed") difluoroethane ("DFE")[1] imme-

---

1. DFE is a noxious gas that is commonly used in aerosol cans as a propellant. When in-

diately before and while operating her vehicle. Based on Packer's history of losing consciousness after huffing DFE and her knowledge of the immediacy and intensity of the effect, we conclude that her conduct constituted the high degree of recklessness required for a finding of malice. We therefore affirm the decision of the Superior Court.

■ The Commonwealth charged Packer with a litany of offenses, including, inter alia, third-degree murder, aggravated assault, aggravated assault with a deadly weapon, homicide by vehicle, homicide by vehicle while driving under the influence ("DUI"), and aggravated assault by vehicle while DUI.[2] A jury trial ensued on October 29, 2014. The evidence presented at trial, recited in the light most favorable to the Commonwealth,[3] is as follows. On the evening of August 6, 2012, Packer and her then-fiancé Julian Shutak drove to a Walmart near State College, Pennsylvania in a Chevrolet Trailblazer that Packer borrowed from her mother. They purchased a video game system, video games, two cans of Dust–Off brand compressed aerosol dust remover and some beverages. They made their purchases with a blank check that had been given to them by Packer's grandmother to purchase Christmas gifts. The two left the store at 9:33 p.m.

Packer and Shutak returned to the Trailblazer—Packer in the driver's seat and Shutak in the front passenger seat. Before driving out of the parking lot, Packer opened the newly purchased dust remover and both she and Shutak huffed, inhaling two to three times in five-to-ten second bursts each time. After huffing, Packer asked Shutak, "How much do you trust me?" to which he responded, "Am I going to die tonight?" N.T., 10/29/2014, at 210, 215. Shutak, who introduced Packer to huffing, was aware that Packer had previously lost consciousness and hallucinated while huffing. He estimated that she had huffed between ten and thirty times in the past.

At 9:37 p.m., Packer drove from the Walmart to a nearby Sheetz, where Shutak purchased cigarettes. Packer then proceeded to drive north on Benner Pike, which had a posted speed limit of fifty-five miles per hour. While stopped at a red light at Shiloh Road, Packer and Shutak again huffed, each taking two two-second bursts. Packer proceeded to drive, but became unresponsive very shortly after this round of huffing. Shutak described her as "zombified," driving with her eyes open

haled—an act commonly referred to as "huffing"—DFE is absorbed into the bloodstream through the lungs and quickly makes its way to the brain within minutes, resulting in a euphoric, yet short lived, high. N.T., 10/29/2014, at 337–41.

2. 18 Pa.C.S. §§ 2502(c), 2702(a)(1), (4); 75 Pa.C.S. §§ 3732(a), 3735(a), 3735.1(a). The Commonwealth also charged Packer with involuntary manslaughter, simple assault, recklessly endangering another person, smell/inhale toxic releasing substances, DUI (drug that impairs safe driving), DUI (solvent or noxious substance), failure to keep right, failure to yield right, driving on roadways laned for traffic, careless driving, reckless driving, and failure to use safety belt. 18 Pa.C.S. §§ 2504(a), 2701(a)(1), 2705, 7303(a); 75 Pa.C.S. §§ 3301(a), 3302, 3309(1), 3714(a), 3736(a), 3802(d)(2), (4), 4581(a)(2)(ii).

3. Our review of a challenge to the sufficiency of the evidence to support a conviction requires that we determine "whether the evidence admitted at trial, and all the reasonable inferences derived therefrom viewed in favor of the Commonwealth as verdict winner, supports the jury's finding of all the elements of the offense beyond a reasonable doubt." *Commonwealth v. Cash*, 635 Pa. 451, 137 A.3d 1262, 1269 (2016) (quoting *Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 894–95 (2009)), *cert. denied sub nom. Cash v. Pennsylvania*, —— U.S. ——, 137 S.Ct. 1202, 197 L.Ed.2d 249 (2017).

and staring straight ahead, "but she wasn't really there." *Id.* at 225, 229. Packer's vehicle began to drift over to the southbound lane into oncoming traffic. She barely missed striking one vehicle. That vehicle honked its horn, but it evoked no response from Packer. A Hyundai Accent, driven by Snyder, was approximately ten to fifteen car lengths behind the first vehicle. Snyder braked extensively and steered away from Packer to try to avoid a collision. Despite his efforts, at 9:42 p.m., just five minutes after leaving the Walmart parking lot, Packer's vehicle struck Snyder's vehicle head on. The airbag module[4] recovered from the Trailblazer indicated that Packer did not engage the throttle or the brake in the five seconds preceding the accident and took no evasive measures to avoid Snyder's vehicle. She was traveling at a rate of forty-two miles per hour at the time of impact.

The force of the collision sent Snyder's Accent airborne. It ultimately landed in a grassy field off the side of the roadway, facing the road. The Trailblazer spun 180 degrees and came to a rest in the southbound lane of Benner Pike. Snyder died within minutes of the crash.

Packer remained unresponsive immediately after the collision and stated after the fact that she was unaware that an accident had occurred. Shutak was eventually able to rouse her by yelling that they had been in an accident. Packer called 9–1–1 to report the accident. During the call, Packer repeatedly asked the operator whether she was going to jail. She asked the same question to an eyewitness and to first responders who arrived at the scene.

In separate conversations immediately following the accident, Packer told emer-gency medical personnel and a state trooper that the crash occurred while she was leaning down to adjust the radio. Packer also volunteered that she had used dust remover in the Walmart parking lot to clean her air vents—a story concocted by Shutak to explain any duster that might be detected in Packer's system. Packer further asked an EMT if the police would be able to detect duster in her blood. None of the individuals who spoke with Packer at the scene of the collision observed any signs of intoxication.

While speaking with police, Packer complained of pain in her chest. Thereafter, she was taken to the hospital by ambulance. Packer consented to the request by police for a blood test at the hospital. The blood draw occurred at 12:47 a.m., three hours after the accident. Subsequent testing of her blood revealed DFE at a concentration of 0.28 micrograms per milliliter.

Packer and Shutak each provided police with two written statements, given on separate occasions. In each of their first written statements, given shortly after the accident, neither Shutak nor Packer mentioned anything about huffing that night. In his second written statement, Shutak admitted that he and Packer had huffed both prior to and while driving on the night of the accident. Packer provided her second written statement to police approximately three months later, in which she likewise admitted to huffing in the Walmart parking lot and while operating the vehicle at the red light on Benner Pike. She was aware that Dust–Off contained a bittering agent, stating that "she could taste it down the back of her throat." *Id.* at 298. She further admitted

---

4. An airbag module records data from an airbag deployment and provides information regarding the vehicle's speed, break and throttle usage, and engine revolutions per minute at the time of deployment and the preceding five seconds. N.T., 10/29/2014, at 261–62.

that she had read the label on the bottle and knew that inhaling the duster could have killed her. *Id.* at 299, 301.

During this interview with police, Packer admitted that she had huffed in the past. She explained that in her prior experiences with huffing "she would black[ ] out." *Id.* As Packer explained it to police, "she would spray it [and] it would make her ... pass[ ] out or black out." *Id.* at 299. She informed police that at the time of the collision she had "blacked out and was over the steering wheel." *Id.* at 299–300. Packer approximated that her typical high from huffing lasted between ten and fifteen minutes.

Expert toxicologist Dr. Wendy Adams testified at trial that the level of DFE found in Packer's blood was on the low side of the detectable range, but explained that DFE has a very short half-life [5]—only twenty-three minutes. According to Dr. Adams, DFE dissipates very quickly in the blood, and that the concentration of DFE in Packer's blood at the time of the collision three hours earlier would have been "several times higher." *Id.* at 344.

Dr. Adams testified that DFE is a commonly abused substance, known for its euphoric effect when inhaled.[6] It is a central nervous system depressant, and its misuse in this manner can result in an individual experiencing dizziness, disorientation, confusion, poor coordination, sleepiness, memory loss, seizures, unresponsiveness, loss of consciousness, loss of muscle control, slurred speech, convulsions, or sudden death. Dr. Adams reported that DFE's effects "are potentially strongly impairing

[but] are also exceptionally short lived." *Id.* at 341. "[P]eak effects and peak concentrations are reached within minutes following inhalation," and "are frequently resolved by the time emergency responders arrive" at the scene of an accident where one of the participants had inhaled DFE. *Id.* at 340–41. It was Dr. Adams' opinion that Packer's intentional inhalation of dust remover was the "direct and substantial cause of the accident." *Id.* at 346.

At the close the Commonwealth's case in chief, Packer orally moved for a judgment of acquittal on the charges of third-degree murder, aggravated assault and aggravated assault with a deadly weapon, arguing that the Commonwealth had not proven beyond a reasonable doubt that Packer acted with malice, a critical element of these crimes. The trial court denied the motion.

The jury convicted Packer of all charges with the exception of aggravated assault with a deadly weapon. On January 23, 2015, the court sentenced Packer to an aggregate term of ten to twenty years of incarceration. Packer filed a timely post-sentence motion challenging, inter alia, the trial court's denial of her motion for judgment of acquittal, asserting that the Commonwealth did not satisfy its burden of proving that she acted with malice to permit her convictions of third-degree murder and aggravated assault. Following argument, the court denied Packer's post-sentence motion.

Packer timely appealed to the Superior Court, challenging, in relevant part, the sufficiency of the evidence to support a

---

**5.** Dr. Adams explained that a half-life is "the time it takes for the concentration in the blood to decrease by half." *Id.* at 343.

**6.** According to Dr. Adams, products containing DFE, including the aerosol duster purchased by Packer and Shutak, commonly con-

tain a bittering agent to dissuade people from misusing the product. *Id.* at 339; Commonwealth's Exhibit 32; *see also* N.T., 10/29/2014, at 214 (Shutak testifying that he usually inhaled DFE through his nose "because it tastes gross").

finding of malice to sustain her convictions of third-degree murder and aggravated assault. In deciding this issue, the Superior Court, in an opinion authored by the Honorable Paula Ott, recognized that an impaired driver who causes the death of another does not typically act with the requisite malice to support convictions of third-degree murder and aggravated assault. *Commonwealth v. Packer*, 146 A.3d 1281, 1285 (Pa. Super. 2016) (citing *Commonwealth v. Kling*, 731 A.2d 145 (Pa. Super. 1999)). It nonetheless concluded that the facts of this case supported a finding of malice:

> We believe there is a qualitative difference between knowingly driving while impaired and knowingly driving when one is aware of a strong likelihood of becoming unconscious. While impairment denotes a diminished capacity for proper functioning, unconsciousness renders a person incapable of functioning, thereby ensuring a person has no opportunity to avoid a collision, and virtually guaranteeing some manner of accident.

> Accordingly, when Packer drove her vehicle immediately after "huffing" at least three times, knowing the likelihood that she could black out and become unconscious, she "disregarded an unjustified and extremely high risk" that her actions "might cause death or serious bodily injury." Therefore, the evidence presented to the jury was sufficient to prove she displayed the malice needed to support the conviction of third[-]degree murder.

> Similarly, those same actions displayed a "conscious disregard for almost certain death or serious bodily injury" needed to demonstrate the malice required to support her conviction of aggravated assault. Therefore, Packer's sufficiency challenge fails.

*Id.* at 1286 (internal citations to *Kling* omitted).

Packer filed a petition for allowance of appeal to this Court. We granted her request to review the following question: "Did the prosecution prove beyond a reasonable doubt that [ ] Packer acted with sufficient malice when she became involved in a fatal motor vehicle accident after she 'huffed' Dust–Off to support her convictions [of] third[-]degree murder and aggravated assault?" *Commonwealth v. Packer*, —— Pa. ——, 163 A.3d 962 (2016). This presents a question of law, for which our standard of review is de novo and our scope of review is plenary. *Commonwealth v. Woodard*, 634 Pa. 162, 129 A.3d 480, 489 (2015), *cert. denied sub nom. Woodard v. Pennsylvania*, —— U.S. ——, 137 S.Ct. 92, 196 L.Ed.2d 79 (2016); *see also supra*, note 3.

Packer argues that precedent from this Court and the Superior Court provide that, except in very limited circumstances, the mens rea for a death resulting from a person driving under the influence of alcohol or a controlled substance only amounts to negligence or ordinary recklessness, either of which is insufficient to constitute malice necessary for convictions of third-degree murder and aggravated assault. Packer's Brief at 17–31 (discussing, inter alia, *Commonwealth v. Dunphy*, 20 A.3d 1215 (Pa. Super. 2011) (finding malice sufficient for third-degree murder conviction where the intoxicated defendant saw pedestrians crossing the street but nonetheless sped up to make the light, striking the victim and killing her, and then failed to stop after the accident); *Commonwealth v. Allen*, 833 A.2d 800 (Pa. Super. 2003) (finding malice sufficient to support conviction of third-degree murder based on the defendant's reckless driving before he fatally struck a pedestrian, his continued driving for 2½ miles with the victim impaled on his

windshield despite a bystander's attempts to stop him, and his continued driving for an additional five miles after the victim rolled off the windshield); *Kling*, 731 A.2d 145 (finding malice sufficient for third-degree murder conviction where the defendant exhibited sustained recklessness prior to fatal accident despite a known or obvious risk of harm to others while racing at a high rate of speed on a dangerous mountain road); *Commonwealth v. Urbanski*, 426 Pa.Super. 505, 627 A.2d 789 (1993) (same for a highly intoxicated defendant who drove erratically and recklessly disregarded his wife's repeated pleas to allow her to drive the car instead prior to the accident); *Commonwealth v. Pigg*, 391 Pa.Super. 418, 571 A.2d 438 (1990) (same for an intoxicated tractor trailer driver who ran several cars off the road and ignored another driver's plea that he stop driving prior to the fatal collision)). She contends that the facts of this case are distinguishable from other cases where the Superior Court found that a defendant was properly convicted of third-degree murder for a death resulting from driving under the influence. She argues that the facts here do not give rise to a finding of malice, which she refers to as requiring a mens rea of "intentional recklessness," to support convictions of third-degree murder and aggravated assault. *See id.* at 21–22, 34–37. In cases like this one, Packer asserts that it is inappropriate for the prosecutor to even charge the defendant with third-degree murder and aggravated assault, as the General Assembly has created other crimes, including homicide by vehicle while DUI and aggravated assault by vehi-

cle while DUI, to punish those who cause a death or serious bodily injury while driving under the influence of alcohol or a controlled substance.[7] *See id.* at 31–33 (discussing *Commonwealth v. McHale*, 858 A.2d 1209 (Pa. Super. 2004) (finding the evidence insufficient to support the mens rea required for aggravated assault as the defendant's conduct was merely negligent when he drove while intoxicated and struck two pedestrians)).

The Commonwealth counters that the evidence, viewed in a light most favorable to the Commonwealth, supports a finding of malice. Specifically, the Commonwealth points to Packer's knowledge of the immediacy of the effect of DFE on her, the likelihood that she would become unconscious after huffing, and her actions before, during and after the accident as proof of malice, distinguishing the circumstances of this matter from cases where the defendant merely knowingly drove while impaired and caused the death of another and aligning it with cases that have found the defendant acted with malice when causing the serious injury or death of another. *See* Commonwealth's Brief at 21–41 (discussing, inter alia, *Dunphy*, 20 A.3d 1215; *McHale*, 858 A.2d 1209; *Allen*, 833 A.2d 800; *Kling*, 731 A.2d 145; *Urbanski*, 627 A.2d 789; *Pigg*, 571 A.2d 438).

While Packer and the Commonwealth each ably dissect the plethora of cases decided by the intermediate appellate court over the past decades grappling with the precise parameters of malice, the broader point made by the arguments of the parties is that each case must be analyzed on its own facts against the standard

---

7. A person is guilty of homicide by vehicle while DUI, a second-degree felony enacted in 1982, if he or she unintentionally caused the death of another caused as a result of the defendant's DUI. 75 Pa.C.S. § 3735(a). A person commits aggravated assault by vehicle while DUI, also a second-degree felony enact-

ed in 1996, if he or she negligently causes a person to suffer serious bodily injury as a result of the defendant's DUI. 75 Pa.C.S.A. § 3735.1(a). As stated above, the jury convicted Packer of these offenses as well. *See supra*, pp. 163, 165–66.

established by this Court. Our purview here is to assure that our longstanding articulated standard, historically applied to intoxicants with cumulative and idiosyncratic effects, is correctly applied to newly emerging powerful and immediate intoxicants that are used by individuals with knowledge of their effects.

Our evaluation of this case begins with the definitions of the relevant crimes.[8] Pennsylvania retains the common law definition of murder, which is a killing conducted "with malice aforethought." *Commonwealth v. Santos*, 583 Pa. 96, 876 A.2d 360, 363 (2005); *Commonwealth v. Thomas*, 527 Pa. 511, 594 A.2d 300, 301 (1991). Section 2502 of the Pennsylvania Crimes Code categorizes murder into degrees. *See generally* 18 Pa.C.S. § 2502(a)-(c). Third-degree murder is defined as "all other kinds of murder," i.e., those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree). *Id.* The pertinent provision of the aggravated assault statute requires proof that the defendant "attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). As both parties recognize, the mens rea required for a conviction of aggravated assault, like third-degree murder, is malice; only the result of the crimes differ. *See Commonwealth v. O'Hanlon*, 539 Pa. 478, 653 A.2d 616, 618 (1995) ("Aggravated assault is, indeed, the functional equivalent of a murder in which, for some reason, death fails to occur."); *Kling*, 731 A.2d at 147 ("There is no distinction between the malice essential to third degree murder

and that necessary for aggravated assault.").

The overarching definition of malice was first provided by this Court in *Commonwealth v. Drum*, 58 Pa. 9 (1868):

> [I]t is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge. Malice is a legal term, implying much more. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Id.* at 15. This definition has been continuously repeated and relied upon in decisions by this Court, *see e.g.*, *Commonwealth v. Fisher*, 622 Pa. 366, 80 A.3d 1186, 1191 (2013); *Santos*, 876 A.2d at 363; *Thomas*, 594 A.2d at 301; *Commonwealth v. McGuire*, 487 Pa. 208, 409 A.2d 313, 316 (1979), and is incorporated into the Pennsylvania Suggested Standard Criminal Jury Instructions for third-degree murder. Pa. SSJI (Crim) § 15.2502C (2016).

While *Drum*'s definition of malice lacks finite parameters, for the purpose of third-degree murder or aggravated assault, "our courts have consistently held that malice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for 'an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'" *Santos*, 876 A.2d at 364 (quoting *Commonwealth v. Young*, 494 Pa. 224, 431 A.2d 230, 232 (1981)).

A killing perpetrated with malice differentiates murder from all other homicides. *Young*, 431 A.2d at 232. "[B]etween

---

8. As Packer challenges only the sufficiency of the evidence presented to support a finding that she acted with the requisite mens rea to convict her of third-degree murder and aggravated assault, our discussion is limited to the evidence presented to support that element.

the recklessness or culpable negligence necessary to support the charge of involuntary manslaughter, and the specific intent to kill which is a prerequisite of murder of the first degree, there is a class of wanton and reckless conduct which manifests such an extreme indifference to the value of human life which transcends the negligent killing and reaches to the level of malice." *Commonwealth v. Taylor*, 461 Pa. 557, 337 A.2d 545 (1975). Therefore, a person who acts negligently or with ordinary recklessness to cause a person to suffer serious bodily injury or death has not committed third-degree murder or aggravated assault, respectively. *See Commonwealth v. Ludwig*, 583 Pa. 6, 874 A.2d 623, 632 (2005) ("the mental state of malice aforethought is significantly more than mere carelessness or neglect, or the disregard of a chance or possibility of death"). One legal scholar has defined the point of demarcation for malicious conduct under Pennsylvania law as "dangerousness"— "the . . . act creates such a dangerous situation" that the resultant deaths or serious bodily injuries "are products of malice." Bruce A. Antkowiak, *The Art of Malice*, 60 Rutgers L. Rev. 435, 471 (2008). As Antkowiak explains, "Malice asks for a solemn, societal judgment about whether [the defendant] was responsible for [a death or serious bodily injury] by bringing about a situation so unnecessarily dangerous to human life that empowering government to exercise its most ominous authority is the only rational societal response." *Id.* at 470.

The quintessential example of the level of recklessness required to constitute malice is a defendant who shoots a gun into a crowd. "If a man fires a gun into a crowd and kills another it is murder, because the fact of the reckless shooting of a gun into a crowd is malice in law. That wicked and depraved disposition and that recklessness and disregard of human life is malice." *Commonwealth v. Malone*, 354 Pa. 180, 47 A.2d 445, 447 (1946) (citing *Commonwealth v. Hillman*, 189 Pa. 548, 42 A. 196 (1899)). *See also Commonwealth v. Daniels*, 467 Pa. 35, 354 A.2d 538 (1976) (affirming a conviction of aggravated assault where the defendant fired several gunshots in a bar full of people, seriously injuring one of the patrons, finding the conduct sufficiently reckless to exhibit an extreme indifference to the value of human life).

In *Malone*, this Court held that the defendant acted with malice when he shot and killed his friend while playing Russian roulette.[9] Addressing the sufficiency of the evidence to support a finding of malice, the *Malone* Court stated:

> The killing of [the victim] by this defendant resulted from an act intentionally done by the latter, in reckless and wanton disregard of the consequences which were at least sixty per cent certain from his thrice attempted discharge of a gun known to contain one bullet and aimed at a vital part of [the victim]'s body. This killing was, therefore, murder, for malice in the sense of a wicked disposition is evidenced by the intentional doing of an uncalled-for act in callous disregard of its likely harmful effects on others.

*Id.* at 449. *See also Young*, 431 A.2d at 232 & n.3 (stating that regardless of intention, the act of pointing a gun at a person's chest without certainty that it is not loaded constitutes "the type of grossly reckless

---

9. The *Malone* decision, referring to this as "Russian Poker," explained that it "is a game in which the participants, in turn, place a single cartridge in one of the five chambers of a revolver cylinder, give the latter a quick twirl, place the muzzle of the gun against the temple and pull the trigger, leaving it to chance whether or not death results to the trigger puller." *Malone*, 47 A.2d at 447 n.1.

conduct which he should have known was likely to result in serious bodily harm or death to another," and that [s]uch a wanton disregard of the consequences of his actions proved that at the time of the shooting appellant possessed that state of mind termed malice").

In the DUI context, this Court has held that the decision to drive while under the influence of alcohol and/or a controlled substance does not, standing alone, constitute malice. In *Commonwealth v. O'Hanlon*, a drunk driver ran a red light and struck another vehicle, seriously injuring the other driver. We found this evidence to be insufficient to sustain a conviction of aggravated assault. *O'Hanlon*, 653 A.2d at 618. We observed that neither "ordinary negligence" nor "mere recklessness" is sufficient to satisfy the mens rea of aggravated assault. *Id.* at 617–18. Instead, we found that the crime "requires a higher degree of culpability, i.e., that which considers and then disregards the threat necessarily posed to human life by the offending conduct," and entails "an element of deliberation or conscious disregard of danger[.]" *Id.* at 618.

> [F]or the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue. The recklessness must, therefore, be such that life threatening injury is essentially certain to occur. This state of mind is, accordingly, equivalent to that which seeks to cause injury.

*Id.* The *O'Hanlon* Court found that the requisite mens rea is only met in circumstances where "the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions ... [but] the consequence was ignored." *Id.*

We subsequently decided *Commonwealth v. Comer*, 552 Pa. 527, 716 A.2d 593 (1998), another case challenging the sufficiency of the evidence to support a conviction of aggravated assault that occurred while the defendant was driving under the influence of alcohol and controlled substances. The defendant in *Comer*, who drove after drinking and ingesting "muscle relaxers," struck two people who were waiting for a bus, killing one and seriously injuring the other. *Id.* at 595. He was observed just prior to the accident traveling at a high rate of speed, in excess of the speed limit. His right tire rubbed against the curb and his car veered off the road, crashing through a bus stand and into a brick wall, striking the two pedestrians in the process.

The *Comer* Court found that the evidence was insufficient to prove that the defendant acted with malice. The accident occurred immediately after he was observed speeding and his tire rubbed along the curb. *Id.* at 597. Examining his behavior before and after the accident, the Court found no evidence "that he was aware of his reckless conduct" and that he "considered, then disregarded, the threat to the life of the victim." *Id.* at 596–97. Finding the facts to be sufficiently similar to those in *O'Hanlon*, we concluded that the conviction of aggravated assault must be reversed. *Id.*

Nearly two decades have passed since we last examined whether, and under what circumstances, the decision to drive under the influence of alcohol and/or a controlled substance rises to the level of malice. Our review of the case before us and the arguments presented reveal no basis to deviate from the holdings announced in *O'Hanlon* and *Comer* that the mens rea generally associated with the decision to drive under the influence is ordinary recklessness and does not constitute malice. This Court, in

*O'Hanlon* and *Comer*, applied the long-standing definition of malice requiring a heightened level of recklessness, and applied it to the facts of those cases. We reaffirm the distinction between ordinary recklessness and malice announced in these cases.

We conclude, however, that the facts of this case distinguish it from *O'Hanlon* and *Comer* such that the courts below did not err in concluding that Packer acted with the malice necessary to support her convictions of third-degree murder and aggravated assault. Here, Packer huffed DFE both immediately prior to and while operating a vehicle on a public highway. N.T., 10/29/2014, at 304. She knew, from the clearly marked label and the bittering agent added to the Dust–Off, that this product was not intended to be ingested. *Id.* at 298–99, 301; Commonwealth's Exhibit 32. She further knew, from her numerous prior experiences with huffing, that the effects of DFE on her were immediate, debilitating and persisted for ten to fifteen minutes following inhalation. N.T., 10/29/2014, at 298–99, 301. Moreover, she knew that huffing had caused her to lose consciousness on other occasions in the past. *Id.* at 223, 230, 298–99.

With all of this knowledge about DFE and the immediate and overwhelming effects it had on her, she nonetheless made the conscious and informed decision to huff four or five bursts of DFE, inhaling the chemical for a total of fourteen to twenty-four seconds within a five-minute timespan. She inhaled immediately before driving on a public roadway and again while temporarily stopped at a red light. Precisely what had previously occurred after huffing happened to her again on the night in question—after inhaling her final bursts of DFE at the red light and proceeding to drive her vehicle on the public highway,

she lost consciousness. Predictably, without control of her vehicle, she killed Snyder.

Viewing the evidence, as we must, in the light most favorable to the Commonwealth, her awareness of the particular dangers her conduct posed is further demonstrated by her behavior before and after the accident. *See Comer*, 716 A.2d at 596–97. The record reflects that after huffing in the Walmart parking lot but before driving, she paused to ask Shutak how much he trusted her. N.T., 10/29/2014, at 210. The record further reflects that immediately following the accident (after she regained consciousness), she lied about what happened, asked about the detectability of DFE in her bloodstream, and repeatedly asked if she was going to jail. *Id.* at 99, 124–25, 129, 148, 155, 162–63.

This is not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated. *See O'Hanlon*, 653 A.2d at 618; *Comer*, 716 A.2d at 597. Packer consciously disregarded an unjustified and extremely high risk that her chosen course of conduct might cause a death or serious bodily injury. *See O'Hanlon*, 653 A.2d at 618; *Santos*, 876 A.2d at 364. Because of Packer's history of losing consciousness after huffing and her knowledge of the immediacy of the effects of huffing on her, she "could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of [her] actions ... [but] the consequence was ignored." *O'Hanlon*, 653 A.2d at 618. *See also Commonwealth v. Levin*, 816 A.2d 1151, 1153 (Pa. Super. 2003) (the defendant's decision to drive after smoking marijuana and drinking alcohol, which caused him to black out and kill a pedestrian, knowing that combining the two caused him to black out in the past, constituted malice sufficient to support his third-degree murder conviction).

We agree with the Superior Court's stated line of demarcation between ordinary recklessness and malice in this case. There is a significant difference between deciding to drive while intoxicated and deciding to drive with knowledge that there is a strong likelihood of becoming unconscious. *See Packer*, 146 A.3d at 1286. The latter is closely aligned with the decision to play Russian roulette—in both instances, the defendant is "virtually guaranteeing some manner of accident" will occur through the "intentional doing of an uncalled-for act in callous disregard of its likely harmful effects on others." *See id.*; *Malone*, 47 A.2d at 449.

In urging reversal of the Superior Court's affirmance of her convictions for third-degree murder and aggravated assault, Packer posits that "the legislature has enacted specific statutes such as homicide by vehicle [while] DUI and homicide by vehicle, which offenses provide more appropriate fits for all but a few [car accidents that result in a death]." Packer's Brief at 33. She is correct to a point: in the vast majority of prosecutions involving deaths or injuries caused by defendants driving under the influence, third-degree murder and aggravated assault should not be charged. The standard for malice enunciated in *Dunn*, reiterated in *O'Hanlon* and reaffirmed today requires recklessness of consequences and the conscious disregard for an unjustified and extremely high risk that a chosen course of conduct might cause a death or serious personal injury. However, this case is one of the few driving while under the influence cases that meets the standard of malice.

For the reasons discussed, the evidence supported a finding that Packer acted with the requisite malice to support her convictions of third-degree murder and aggravated assault for the death and serious bodily injury she caused when she decided to drive a vehicle under the influence of DFE. We therefore affirm the decision of the Superior Court.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.