J-A21028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN R. PETERS | : | |
| | : | |
| Appellant | : | No. 2591 EDA 2021 |

Appeal from the Judgment of Sentence Entered October 15, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003901-2020

BEFORE: LAZARUS, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.: **FILED FEBRUARY 24, 2023**

Kevin R. Peters appeals from the judgment of sentence, entered in the Court of Common Pleas of Bucks County, following his convictions of two counts each of third-degree murder,[1] aggravated assault – serious bodily injury,[2] recklessly endangering another person,[3] homicide by vehicle while driving under the influence (DUI),[4] aggravated assault by vehicle while DUI,[5]

---

[1] 18 Pa.C.S.A. § 2502(c).

[2] *Id.* at § 2702(a)(1).

[3] *Id.* at § 2705.

[4] 75 Pa.C.S.A. § 3735(a)(1)(i).

[5] *Id.* at § 3735.1(a).

homicide by vehicle,[6] and aggravated assault by vehicle.[7]   The trial court

separately found Peters guilty of DUI – general impairment,[8] DUI – high rate

of alcohol,[9] and summary offenses of driving within single lane,[10] following too

closely,[11] driving vehicle at safe speed,[12] and reckless driving[13] (collectively,

"non-jury offenses").   Peters challenges the sufficiency of the evidence with

respect to the third-degree murder and aggravated assault convictions.   In

particular he argues the Commonwealth did not prove malice.   After careful

review, we affirm in part, reverse in part, and vacate Peters' convictions of

third-degree murder and aggravated assault – serious bodily injury.

The trial court summarized the factual history as follows:

> Shortly after midnight on Friday, December 6, 2019, Nicholas
> Hafto called 911 police emergency and reported that he was
> driving on Interstate 95 (I-95) North, and that "there is a white
> Mazda SUV, swerving, almost sideswiped me, he came flying right
> by me."  At trial, [] Hafto further explained that the SUV erratically
> changed speeds, back and forth from fast to slow.  He stated that
> the SUV made an abrupt exit off I-95 at the Route 29 New Jersey

---

[6] *Id.* at § 3732(a).

[7] *Id.* at § 3732.1(a).

[8] *Id.* at § 3802(a)(1).

[9] *Id.* at § 3802(b).

[10] *Id.* at § 3309(1).

[11] *Id.* at § 3310(a).

[12] *Id.* at § 3361.

[13] *Id.* at § 3736(a).

exit, noting that while exiting, the operator of the SUV slammed on his brakes.

Another motorist, Scott Emrick, also called 911. He reported that he was also traveling on I-95 and observed a white Mazda SUV "swerving left and right." He also reported erratic acceleration, deceleration, and a sharp exit off I-95 and noted that the vehicle's headlights were not on.

Surveillance cameras captured images of the SUV as it exited I-95 into New Jersey. Approximately one minute later, the vehicle reentered the highway and proceeded south.

At approximately 1:00 a.m., Edmonde Sestini, Jr., a driver working for Clarion Ambulance, was driving south on I-95 at a speed between 50 and 60 miles per hour [(mph)] when a white Mazda SUV passed him at a high rate of speed. [] Sestini testified that the SUV "came flying past me on the left-hand side." Approximately half a minute later, and approximately [one-]half[ ]mile further down I-95, [] Sestini came upon the SUV stopped behind a second vehicle[,] which was facing north in the southbound lane of traffic and completely engulfed in flames. One man had already been able to get out of [the burning] vehicle, [and] another man was trying to get out. [] Sestini and his partner removed [Peters] from behind the wheel of the [white Mazda] SUV, and due to complaints of hip pain, placed him on the ground and dragged him away from the fire.

The collision occurred near the Ford Road overpass in Bristol Township, Bucks County. At approximately 1:05 a.m., the State Police were dispatched. Upon arrival at the scene, police found a van fully engulfed in flames and a 2016 Mazda CX-5 SUV, bearing PA registration KFY-1783, with heavy front-end damage. . . . [Peters] was transported from the scene to Jefferson Torresdale Hospital in Northeast Philadelphia.

Two men involved in the collision, . . . Juan Tavarez, and his son, Charlys Tavarez Santelises, were able to extricate themselves from the burning vehicle and make their way to Jefferson Torresdale Hospital. The bodies of [Tavarez's other son, Juan Jose Tavarez Santelises] and Claribel Dominguez were removed from the rear seat of the van. Later that same day, forensic pathologist Dr. Ian Hood autopsied the bodies and determined to a reasonable

degree of medical certainty that thermal burns caused the death of both individuals.

The survivors, [] Tavarez and [] Santelises, suffered permanent injuries and testified at length to the extent of their injuries and the treatment they received.

\* \* \*

Subsequent investigation into the cause of the collision revealed that the occupants of the van were driving on I-95 south returning from working an 11-hour shift at a New Jersey package[-]sorting plant. [] Tavarez, the driver of the van, drove at a speed of between 50 and 55 [mph] as a precautionary measure due to a slight whistling sound in the van. Because of their reduced speed, . . . Tavarez[] activated his emergency flashers and moved into the right lane of traffic. The first indication that he had of what was about to occur was what [] Tavarez described to be like a bomb going off, immediately followed by an engulfing fire.

[Peters] had spent the evening at an open bar social event before proceeding to two separate bars. The open bar event was held in a private room at Ruth's Chris Steak House in Philadelphia and ran from 5:00 p.m. through 8:00 p.m. During these hours[, Peters] was drinking vodka. He and his co-workers then moved to the [Ruth's Chris Steak House] public bar where [Peters] consumed bourbon. Co-worker Jacquelyn Smith testified that she had offered [Peters] a ride home shortly after 10:00 p.m., but he declined, instead [] asking to be taken to another bar, the "Rogue's Gallery," with one of his co-workers. The other co-workers used private transport services. A receipt from the Rogue's Gallery indicated three drinks were ordered in total: one "Love City Lager" and two "Neshaminy 2X IPAs." [Peters] testified that he consumed two of these drinks. The bill was paid at 12:18 a.m. Shortly thereafter, a video from the parking garage of [Peters'] workplace showed that he was unable to operate the automated payment machine. [Peters] physically lifted the gate to leave the garage[, causing damage to the gate]. Once he left the garage, surveillance cameras captured images of [Peters] driving through a stop sign. Video surveillance footage from the Scudder-Falls Bridge area as it crosses [from] Pennsylvania into New Jersey shows [Peters] changing lanes and exiting the highway without using turn signals.

On December 6, 2019, at 1:45 a.m., an employee of Jefferson Torresdale Hospital drew a blood sample from [Peters]. Police seized a serum plasma sample from [the blood previously drawn on December 6, 2019] pursuant to a search warrant executed on December 18, 2019. That sample was later submitted to National Medical Services for analysis. The alcohol content of the serum plasma was determined to be 183 milligrams per deciliter. The plasma alcohol concentration was then converted into whole blood alcohol concentration [(BAC)]. [Peters] had a [BAC] of .151 percent. Toxicologist Donna Papsun offered her expert opinion that an individual with a BAC of .151 percent is incapable of safe driving.

Corporal Brianne Glad, an accident reconstruction expert, testified that she downloaded information from the event date recorder, or "black box," from [Peters'] vehicle. That information established [Peters] was traveling at a speed of 113 [mph] five seconds prior to the collision with the victims' van. . . . Half a second prior to the collision, [Peters] was traveling at 115 [mph]. [Peters] did not apply [his vehicle's] brakes until [] four-tenths of a second before impact. [Peters testified that immediately before the collision, he momentarily took his eyes off the road, and reached over to retrieve his cell phone, located in a backpack on the front passenger seat.]

Trial Court Opinion, 3/4/22, at 1-3, 5-6 (citations omitted).

In May 2020, the Commonwealth charged Peters with the aforementioned offenses. On September 13, 2021, Peters proceeded to a jury trial. The jury subsequently convicted Peters of the aforementioned crimes, and the trial court convicted him of the non-jury offenses. On October 15, 2021, the trial court imposed an aggregate sentence of 19½ to 39 years of imprisonment. Ten days later, Peters filed a motion for reconsideration of sentence, which the trial court denied on November 9, 2021. Peters filed a timely notice of appeal. Both Peters and the trial court have complied with Pa.R.A.P. 1925.

Peters now raises a single question for our review:

Was the evidence insufficient as a matter of law to sustain the verdicts for [t]hird[-d]egree [m]urder and [a]ggravated [a]ssault [– c]ausing [s]erious [b]odily [i]njury where the prosecution['s] proof showed that [Peters], intoxicated, caused a tragic accident resulting in deaths and injuries but did not establish the requisite *mens rea* of malice?

Brief for Appellant, at 5.

Peters' sole contention on appeal is that the Commonwealth presented insufficient evidence to prove he acted with malice in the vehicle accident that caused the deaths of Juan Jose Tavarez Santelises and Claribel Dominguez, as well as the serious injuries of Juan Tavarez and Charlys Tavarez Santelises. *See id.* at 17-26. Peters argues that, under Pennsylvania law, merely driving while intoxicated does not sustain a finding of malice. *Id.* at 18-20. Peters contends that he, while driving at high speeds, attempted to apply the brakes prior to the accident and attempted to swerve out of the way of the minivan. *Id.* at 20-26. Peters asserts that, just prior to the accident, he was seen operating his vehicle at speeds both higher and lower than the posted speed limit, passing vehicles in the left lane, exiting a highway at a safe speed, and operating his vehicle within a single lane of travel. *Id.* Additionally, Peters argues that no one, prior to the accident, informed Peters that he was too drunk to drive. *Id.* at 20. Peters further argues that he has no history of drunk driving, or being too intoxicated to drive, that none of the videos depicts any signs of visible impairment, and that he was not belligerent after the crash and did not attempt to the flee the scene. *Id.* In total, Peters asserts that

these factors preclude a finding of malice under Pennsylvania case law. *Id.* at 20-26. We are constrained to agree.

When examining a challenge to the sufficiency of the evidence, we adhere to the following standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

The Crimes Code defines aggravated assault – serious bodily injury as "when a person attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly[,] or recklessly under circumstances manifesting an extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1).

The Crimes Code defines third-degree murder as "[a]ll other kinds of murder" other than first and second-degree murder and classifies it as "a felony of the first degree." 18 Pa.C.S.A. § 2502(c). To sustain a conviction of third-degree murder, the Commonwealth must prove that the defendant killed another person with malice. *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa. Super. 2007). "Third[-]degree murder occurs when a person commits a killing [that] is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *Commonwealth v. Truong*, 36 A.3d 592, 597 (Pa. Super. 2012) (en banc) (citation omitted). Malice is a legal term, which encompasses "not only a particular ill-will, but every case where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (citation omitted). A fact-finder may find malice not only in an intentional killing, "but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury." *Commonwealth v. Ludwig*, 874 A.2d 623, 632 (Pa. 2005) (quotation and citation omitted).

The malice requirements for aggravated assault and third-degree murder are the same. *Packer*, 168 A.3d at 168. The malice required to sustain a third-degree murder or an aggravated assault conviction exists

"where the accused acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury." *Commonwealth v. Mercado*, 649 A.2d 946, 955 (Pa. Super. 1994) (citation omitted). "In view of this heightened *mens rea*, motor vehicle crashes seldom give rise to proof of the malice needed to sustain a conviction for third[-]degree murder[.]" *Commonwealth v. Kling*, 731 A.2d 145, 148 (Pa. Super. 1999). "However, in some circumstances, the malice requirement has been met, and this [C]ourt has not hesitated to uphold an aggravated assault or a third[-]degree murder charge depending on the particular facts of a motor vehicle crash." *Commonwealth v. Riggs*, 68 A.3d 780, 785 (Pa. Super. 2012).

In the context of a DUI, the decision to drive while under the influence of alcohol and/or a controlled substance does not, standing alone, constitute malice. *Commonwealth v. O'Hanlon*, 653 A.2d 616, 618 (Pa. 1995). This type of crime "requires a higher degree of culpability, *i.e.*, that which considers and then disregards the threat necessarily posed to human life by the offending conduct," and entails "an element of deliberation or conscious disregard of danger[.]" *Id.* "For th[is] degree of recklessness . . . to occur, the offensive act must be performed under circumstances [that] **almost assure that injury or death will ensue**." *Id.* (emphasis added). "The recklessness must, therefore, be such that life threatening injury is **essentially certain** to occur." *Id.* (emphasis added). "This state of mind is,

accordingly, equivalent to that which seeks to cause injury." *Id.* This *mens rea* requirement is met only in circumstances where "the defendant could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of his actions . . . [but that] consequence was ignored." *Packer*, 168 A.3d at 170-71 (reaffirming distinction between ordinary recklessness and malice).

Pennsylvania courts have frequently had occasion to address the concept of "malice" as applied in the context of motor vehicle accidents. Our Supreme Court previously announced the requisite degree of malice and recklessness, described above, in *O'Hanlon*, *supra* and *Commonwealth v. Comer*, 716 A.2d 593 (Pa. 1998), and recently reaffirmed in *Packer*, *supra*. In *Packer*, our Supreme Court addressed this "notice," or "warning," requirement of malice with respect to motor vehicle accidents, noting:

> Packer huffed DFE [difluoroethane] immediately prior to and while operating a vehicle on a public highway. She knew, from the clearly marked label and the bittering agent added to the Dust-Off, that this product was not intended to be ingested. She further knew, **from her numerous prior experiences with huffing, that the effects of DFE on her were immediate, debilitating**[,] **and persisted for ten to fifteen minutes following inhalation. Moreover, she knew that huffing had caused her to lose consciousness on other occasions in the past.**
>
> With all of this knowledge of DFE and the immediate and overwhelming effects it had on her, she nonetheless made the conscious and informed decision to huff four or five bursts of DFE, inhaling the chemical for a total of fourteen to twenty-four seconds within a five-minute timespan. She inhaled immediately before driving on a public roadway and again while temporarily stopped a red light. Precisely what had previously occurred after huffing

happened to her again on the night in question—after inhaling her final bursts of DFE at the red light and proceeding to drive her vehicle on the public highway, she lost consciousness. Predictably, without control of her vehicle, she killed [the victim].

Viewing the evidence, as we must, in the light most favorable to the Commonwealth, her awareness of the particular dangers her conduct posed is further demonstrated by her behavior before and after the accident. The record reflects that after huffing in the Walmart parking lot, but before driving, she paused to ask [her fiancé] how much he trusted her. . . . [I]mmediately following the accident (after she regained consciousness), she lied about what happened, asked about the detectability of DFE in her bloodstream, and repeatedly asked if she was going to jail.

This is not a typical case of ordinary recklessness that arises when someone chooses to drive while intoxicated. Packer consciously disregarded an unjustified and extremely high risk that her chosen course of action might cause a death or serious bodily injury. **Because of Packer's history of losing consciousness after huffing and her knowledge of the immediacy of the effects of huffing on her**, she "could reasonably anticipate that serious bodily injury or death would be the likely and logical consequence of [her] actions . . . [but] the consequence was ignored.

*Packer*, 168 A.3d at 171 (emphasis added) (citations omitted).

In *Comer*, the defendant drove after drinking and ingesting "muscle relaxers." *See Comer*, 716 A.2d at 595. The defendant was observed, just prior to the crash, scraping his right tire against the curb, traveling in excess of the speed limit, veering off the road, and crashing through a bus stand and into a brick wall. *Id.* He struck two pedestrians in the process, killing one and seriously injuring the other. *Id.*

Our Supreme Court concluded that the evidence in *Comer* did **not** support a finding of malice. Notably, the Court determined that after examining the defendant's behavior before and after the accident, there was

no evidence "that he was aware of his reckless conduct" or that he "considered, then disregarded, the threat to the life of the victim." *Id.* at 596-97.

Instantly, the trial court concluded that the Commonwealth had presented sufficient evidence of malice. *See* Trial Court Opinion, 3/4/22, at 10-12. The trial court relied on a series of decisions made by Peters and found that he had exhibited a "conscious disregard for the safety of others." *Id.* at 10. In particular, the trial court faulted Peters for failing to take the train home; failing to stay at a hotel; failing to take an Uber, Lyft, or taxi; failing to accept a ride offered by a co-worker; deciding to drive after he was unable to operate the parking garage gate; failing to use turn signals; alternating his speeds from fast to slow; passing other vehicles too closely; and taking his eyes off the road to look for his phone. *Id.* at 11.

The Commonwealth, in its brief, argues the same points as relied upon by the trial court. *See* Commonwealth's Brief, at 27-57. The Commonwealth further contends that Peters' actions were malicious, cruel, and demonstrated a lack of care for others' safety. *Id.*

After reviewing the record, we conclude that the Commonwealth failed to present sufficient evidence of the required malice to sustain Peters' convictions of aggravated assault and third-degree murder. First, malice requires that the recklessness exhibited must be essentially certain to cause the death or serious bodily injury. *See O'Hanlon*, *supra*; *Packer*, *supra*. It is insufficient to prove that someone's bad decisions **could have** or **may**

**have** or **likely would** result in death or serious bodily injury. **O'Hanlon**, **supra**; **Packer**, **supra**. The trial court's opinion omits mention of this essential requirement, and the Commonwealth appears to ignore it as well, encouraging this Court to view the facts in a light inappropriately favorable to itself.[14] **See** Trial Court Opinion, 3/4/22, at 1-12; Commonwealth's Brief, at 29, 30, 50.

Second, Peters' decisions to drive his vehicle instead of taking a train or taxi, and to use a highway rather than a local road, are of no moment. **See** Trial Court Opinion, 3/4/22, at 10-11. Indeed, our law is clear that the mere decision to drive intoxicated does not satisfy the malice requirement. If these factors met the requirement of malice, then every DUI homicide would result in a third-degree murder conviction. We emphasize, again, that merely driving drunk does not meet the heightened *mens rea* requirement outlined in **O'Hanlon** and **Comer**, and reaffirmed in **Packer**.

Third, the facts of this case reveal that the Commonwealth failed to present sufficient evidence of the "warning" requirement of malice necessary for third-degree murder and aggravated assault in the DUI context. Peters' inability to operate the parking garage kiosks is not a "warning" contemplated

---

[14] The Commonwealth also suggests that the proper analysis of malice is whether Peters' actions "might" create a risk of death or serious bodily injury and that Peters should have "reasonably anticipate[d]" that death or serious bodily injury would "likely" result." **See id.** at 29, 30, 50. This interpretation of the law is incorrect and represents a significantly lesser burden than Pennsylvania courts have routinely required for decades. **See Packer**, **supra**; **O'Hanlon**, **supra**.

by our case law. *See Commonwealth v. Urbanski*, 627 A.2d 789, 793 (Pa. Super. 1993) (concluding appellant's wife's repeated reminders of the danger of drunk driving and repeated requests he let her drive instead, conveyed a sufficient warning for malice). Additionally, the record is equally silent on whether Peters had a history of drunk driving. *See Packer*, *supra* (defendant's personal knowledge that inhaling DFE caused defendant to black out previously while driving plus asking if fiancé "trusted her," exhibited conscious disregard for almost certain death or serious bodily injury). Moreover, the Commonwealth's urging that the malice requirement is satisfied because "every adult" knows the dangers of alcohol is similarly unavailing. Indeed, as we stated and emphasize above, merely driving while intoxicated does not create the requisite malice for third-degree murder or aggravated assault serious bodily injury. *See Packer*, *supra*; *Comer*, *supra*.

Additionally, the Commonwealth's argument that two drivers called 9-1-1 to report Peters' driving is of no moment.[15] Neither of those phone calls communicated the warning to Peters himself, and neither of the driver's testified that they warned Peters by flashing their headlights or utilizing their

_____

[15] As to Peters' claim that there was no evidence that drivers of other cars were trying to stop him from driving, the Commonwealth states "there is no evidence that there **weren't** any actions of others trying to stop. Throughout the entirety of his driving that night there **may have been** instances of cars trying to get his attention to stop or slow down." Commonwealth's Brief, at 47 (emphasis added). We have found no support for this claim anywhere in the record. While we can understand the difficulty in uncovering evidence in cases such as this, we caution the Commonwealth that we cannot engage in such speculation. If other drivers existed who warned Peters, it was the Commonwealth's burden to find them and bring that evidence to the jury.

horns. Indeed, Hafto, the first 9-1-1 caller, testified that he observed Peters' vehicle pass him at a high rate of speed. N.T. Jury Trial Day 1, 9/13/21, at 139-40. In response, Hafto stayed behind the Mazda and gave it a wide birth. *Id.* Hafto testified that as he followed the Mazda, it drove both over and under the posted speed limit of 65 miles per hour. *Id.* at 152-53. Hafto drove in such a way that kept the Mazda in front of him at all times. *Id.* at 151-53 (Hafto testifying that he would decrease speed to avoid passing Mazda). Emrick, the second 9-1-1 caller, initially testified that the Mazda was driving erratically and, in the 9-1-1 phone call recording, stated that the driver's vehicle lights were off. *See* N.T. Jury Trial Day 2, 9/14/21, at 7-8; *id.* at 13 (Commonwealth Exhibits 3 and 4, Emrick's 9-1-1 call, admitted into evidence).[16] However, Emrick also testified that the Mazda exited the highway safely. *Id.* at 10. These phone calls certainly portrayed Peters' driving as, no doubt, negligent, careless, and reckless at times. Nevertheless, we emphasize that neither of these drivers attempted to communicate to Peters, via horns or headlight flashing, that he was driving erratically. *See* N.T. Jury Trial Day 1, 9/13/21, at 138-55 (Hafto's testimony); N.T. Jury Trial Day 2, 9/14/21, at 5-26 (Emrick's testimony).

Furthermore, the Commonwealth argues that the offer of a ride home by Peters' co-worker, Jacquelyn Smith, should have warned Peters that he

---

[16] Emrick's 9-1-1 call was divided into two exhibits because, during Emrick's phone call, he and Peters crossed over the state line into New Jersey and his call was transferred to New Jersey's 9-1-1 service. *See id.* at 11-12.

was unable to drive. Commonwealth's Brief, at 9, 45-46. We are unpersuaded by this contention. Smith testified that she offered a ride to **every** co-worker at the party. N.T. Jury Trial Day 2, 9/14/21, at 114-15. Smith also testified that, while she arrived late to the work party, she too was drinking alcohol. **Id.** at 108-13 (Smith testifying between her arrival at 6:30 p.m. and her departure at 10:00 p.m., everyone ordered at least three drinks). Additionally, even though Smith offered Peters a ride, she did not caution Peters that he had consumed too much alcohol or warn him not to drive. **Id.** at 114-16 (Smith testifying she offered Peters a ride because they both lived in Bucks County and she did not offer to drop him off at train station or any other alternative). Under these facts, we cannot conclude that Smith's actions warned Peters of his inability to drive. **See Urbanski**, **supra**; **Commonwealth v. Pigg**, 571 A.2d 438, 442 (Pa. Super. 1990) (finding of malice supported where defendant, operating 18-wheeler, drove other drivers off road and ignored requests of fellow driver to stop driving).

Next, throughout its brief, the Commonwealth argues that because Peters' vehicle lights were off, he was consciously disregarding a known risk to other drivers. **See** Commonwealth Brief, at 42, 53-55. This contention does not change the outcome of this case. It is clear, from our review of the record, that Peters was never alerted to any issues with his lights. After the accident, Trooper Robert Ace investigated Peters' Mazda and concluded that the headlight switch was in the "on" position, and that the damage from the accident prevented an accurate assessment of whether the brake lights were

operable. *See* N.T. Jury Trial Day 3, 9/15/21, at 22-28. Before the accident, while both Hafto and Emrick testified that at various points it appeared as though Peters' headlights were off, neither warned Peters. *See* N.T. Jury Trial Day 1, 9/13/21, at 138-55; N.T. Jury Trial Day 2, 9/14/21, at 5-26. Additionally, in every video the Commonwealth presented of Peters' driving, his headlights were on and lit. *See* N.T. Jury Trial Day 3, 9/15/21, at 182-88, 196-97 (Trooper Brandon Corby, testifying regarding contents of videos recovered); Commonwealth Exhibits 43 and 44 (surveillance videos from parking garage, depicting Mazda's headlights on); Commonwealth Exhibit 42 (security video from exterior of parking garage, depicting Mazda's headlights on, but brakes lights off); Commonwealth Exhibit 48 (Philadelphia street surveillance video depicting Mazda's headlights on, but brake lights off); Commonwealth Exhibits 49 and 50 (Philadelphia street surveillance stills depicting Mazda's headlights on, but brake lights off); *see also* N.T. Jury Trial Day 3, 9/15/21, at 197-200 (Trooper Corby testifying regarding Scudder-Falls Bridge videos); Commonwealth Exhibit 52 (Scudder-Falls Bridge video depicting Mazda's headlights on, but brake lights off). At best, this evidence demonstrates that Peters believed his brake lights and headlights were operable, and on, at least some of the time leading up to the accident. However, this evidence does not demonstrate Peters' awareness or conscious disregard of the failing brake lights. Accordingly, the Commonwealth's arguments regarding the brake lights does not support Peters' conviction for third-degree murder or aggravated assault – serious bodily injury.

Finally, Corporal Glad, the Commonwealth's accident reconstruction expert, testified that Peters did apply his brakes before the collision. *See* N.T. Jury Trial Day 3, 9/15/21, at 40-123 (Commonwealth expert testifying regarding speed of vehicles and "black box" recordings). Corporal Glad testified that the Mazda's "black box" recorded speeds in excess of 100 miles per hour just prior to the crash. *Id.* at 90-1 (Mazda approached speed of 115 miles per hour approximately one second before impact). Approximately four-tenths of a second prior to the crash, the Mazda's black box also recorded "weight" being released from the accelerator pedal and "weight" being applied to the brake pedal. *Id.* at 91-92. Corporal Glad explained that this data indicates that the brakes were applied prior to the crash. *Id.* Thus, it is clear from the evidence that Peters applied the brakes, albeit quite literally at the last second. *See Commonwealth v. Dellavecchia*, 725 A.2d 186, 189 (Pa. Super. 1998) (en banc) (Commonwealth presented insufficient evidence of *mens rea* element of recklessness for aggravated assault where defendant drove at excessive speeds, wove in and out of congested city traffic, had BAC of .194%, but applied brakes prior to accident "in an effort to avoid impact").

In conclusion, the Commonwealth presented insufficient evidence to sustain the malice requirement of either third-degree murder or aggravated assault – serious bodily injury. *Smith*, *supra*. Even considering the totality of the circumstances, we are compelled to reverse these convictions. While the facts of this case are horrific and heartrending, they simply do not support a finding of malice. Accordingly, we vacate Peters' convictions of third-degree

murder and aggravated assault-serious bodily injury, and remand for re-sentencing. ***See Commonwealth v. Williams***, 997 A.2d 1205, 1210-11 (Pa. Super. 2010) ("[I]f a correction by this Court may upset the sentencing scheme envisioned by the trial court, the better practice is to remand [for resentencing].") (citation omitted).

Judgment of sentence vacated. Convictions for third-degree murder and aggravated assault-serious bodily injury reversed. Appellant discharged thereon. In all other respects, Appellant's convictions are affirmed. Case remanded for resentencing. Jurisdiction relinquished.

McCaffery, J., joins the Memorandum.

Murray, J., files a Dissenting Memorandum.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/2023

- 19 -