J-A26010-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                       :          PENNSYLVANIA
                                       :
            v.                          :
                                       :
                                       :
HAINAN CHANG                     :
                                       :
               Appellant        :     No. 903 EDA 2020

Appeal from the Judgment of Sentence Entered February 14, 2020
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001604-2018

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:           **FILED JANUARY 5, 2021**

Appellant, Hainan Chang, appeals from the judgment of sentence of an aggregate term of 5 to 13 years' imprisonment, imposed after she was convicted by a jury of involuntary manslaughter and endangering the welfare of a child (EWOC). Appellant solely challenges the discretionary aspects of her sentence. After careful review, we affirm.

Appellant was charged with third-degree murder, criminal homicide, involuntary manslaughter, and EWOC.[1] The charges were premised on the death of E.Z., a young boy in Appellant's care, who died of injuries consistent

---

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant was also charged with voluntary manslaughter and two counts of aggravated assault, but those charges were withdrawn prior to her trial.

with shaken baby syndrome. At Appellant's jury trial, the evidence established

the following facts:

> At approximately 9:40 a.m. on Thursday, January 8, 2015, Appellant entered the emergency department of the Chester County Hospital carrying E.Z, a 20[-]month[-]old male child. Appellant reported to staff that E.Z. was non-responsive. A nurse, Jennifer Walsh ("Nurse Walsh"), took E.Z. from Appellant. At trial, she testified that she had never held a child whose body temperature was so extremely cold, and that E.Z. "looked dead." All attempts by the hospital staff to resuscitate E.Z. failed and he was pronounced dead at 10:13 a.m.
>
> During trial, evidence was admitted in the form of pictures and testimony indicating that E.Z. had significant external bruising to his forehead, and bruising on his neck and chest. It was also noted that lividity was visible on E.Z.'s back. As per hospital protocol when a child dies, the police were called. The police investigation began with taking Nurse Walsh's statement and photographing the bruising to E.Z. and the lividity apparent on his back.
>
> A statement was taken from Appellant. Additional statements were taken from the other members of Appellant's household: her husband[,] Sui Fung Lee ("Lee"), and her two minor children. During these statements, it was explained to police that E.Z. was not biologically related to Appellant or her husband. Appellant undertook custody of E.Z. and was responsible for his daily care and needs as a result of a request made by Appellant's very close friend and E.Z.'s biological aunt…. … In 2014, [E.Z.'s mother] needed to find a full time care[-]giver for E.Z. while she and E.Z.'s father … worked in Florida.
>
> ***
>
> Appellant reported that on the morning of January 7, 2015, the day before E.Z. was pronounced dead at the hospital, she followed her regular schedule. However, Lee[, who worked night shift,] did not return home in the morning after work. On that particular day, Lee left work and went to his parent's house to take a nap before heading out to a friend's home to work on the friend's HVAC system. Lee did not arrive at home until approximately 3:00 p.m.

Appellant stated that after her children left for school on [January] 7, 2015[,] she cleaned[]up from breakfast and then fed E.Z. lunch in the high chair at the usual time. A little later, she took him out of the high chair and placed him on the floor to play. She then began her household chores. At one point, she was in her son's bedroom and heard E.Z. crying in the dining room area. She found him under the table and pulled him to her. She recalls seeing a red mark on his forehead. She reported that it was not unusual to find bruises on E.Z.'s body because he was very clumsy and fell or ran into furniture often. That morning, he cried for 10-15 minutes before he quieted down. She noticed he spit up some food onto his clothes and was very tired. She placed him in the high chair and he fell asleep right away. She allowed him to sleep in the high chair while she continued with her afternoon household duties.

At approximately 3:00 p.m., Lee returned home and Appellant instructed him to be quiet because E.Z. was still asleep in the high chair. It was at that time that Appellant moved E.Z. to the living room couch so that he could continue sleeping. She did not attempt to feed him dinner because he seemed to continue to be tired and he did not want to wake-up. Lee left for work at approximately 8:30 p.m. At approximately 10:30 p.m., she moved E.Z. into the high chair and tried to feed him because he had not eaten anything during the day, but he did not want to eat. She stated she was not concerned with his excessive "sleeping" because on previous occasions he had refused to eat and just wanted to sleep when he felt ill. She stated that at that time, E.Z. felt cold and she placed him in her bed with her to warm him up. At approximately 1:00 a.m., E.Z. felt warmer and she moved him to his bed[,] which was a mat on the floor next to her bed.

On January 8, 2015, Appellant awoke at her regular time. She noted that E.Z. was sleeping[,] and [she] left him in his bed on the floor. She prepared her children's breakfast and then checked on E.Z. He was still sleeping. Lee returned home from work at approximately 7:30 a.m. and went to lay down in his daughter's room while his children got ready for school. Appellant instructed her children to walk to the bus stop alone as she had to stay with E.Z. because he was not feeling well. … [S]he tried to feed E.Z.[,] but the milk just spilled out of his mouth and she noted that E.Z.'s lips were white and his face was cold. She woke Lee and told him that they needed to go to the hospital because E.Z. was not well. She then called [E.Z.'s aunt] to tell her they were going to the hospital and for her to bring E.Z.'s insurance

- 3 -

information. Lee asked Appellant if he should call 911 for an ambulance. Appellant stated it would be faster if they took E.Z. to the hospital themselves. Appellant stated to the jury during her testimony that prior to taking E.Z. to the hospital she did not check to see if he was breathing.

Appellant has consistently maintained that she did not cause any physical injuries to E.Z. The bruising to the neck and chest were the result of a fall he had when she was bathing him a few days previously. She stated that she did not see any extensive bruising on his head except for some redness as a result of hitting something before she pulled him from under the table on January 7, 2015. She doesn't know exactly what happened because she was in another room. She stated that E.Z. was fine except that when she attempted to feed him lunch on January 7, 2015[,] he was very sleepy.

On January 7, 2015, E.Z. was alone in the house with Appellant from the time her children left for school in the morning until the time Lee arrived home at 3:00 p.m. When Lee arrived home, E.Z. was already unconscious in the high chair. He then continued to be unconscious until he was pronounced dead on January 8, 2015[,] at 10:13 a.m.

Contrary to the history given by Appellant to the hospital and the police that E.Z. had no "boo-boos" from bumping his head on the morning of January 7, 2015, the post-mortem medical evidence revealed that E.Z. suffered severe brain trauma as a result of rapid acceleration and deceleration of the head, *i.e.*[,] shaken baby syndrome, and there was significant subdural hemotoma due to blunt force trauma. These injuries were not the result of the usual impact suffered by toddlers falling or hitting furniture. The severity of E.Z.'s injuries mimicked injuries suffered as a result of a high speed car accident.

The jury found Appellant's claim that she did not know what happened to E.Z. to have little credibility and found her guilty of [i]nvoluntary [m]anslaughter and EWOC. At the time of sentencing, Appellant remained firm in her position that she did not know what happened to E.Z. She only accepted responsibility for not appropriately evaluating E.Z.'s symptoms and for not taking him to the hospital sooner. She denies any other action or omission on her part that could have caused E.Z.'s traumatic brain injuries.

Trial Court Opinion (TCO), 5/19/20, at 2-7 (footnotes omitted).

After a pre-sentence investigation (PSI) report was completed, the trial court conducted Appellant's sentencing hearing on February 14, 2020. At the close thereof, the court imposed three to eight years' incarceration for Appellant's involuntary manslaughter conviction, and a consecutive sentence of two to five years' imprisonment for her EWOC offense. Thus, Appellant's aggregate sentence is 5 to 13 years' imprisonment.

Appellant filed a timely motion to modify her sentence, which was denied. She then filed a timely appeal, and she complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed its Rule 1925(a) opinion on May 19, 2020. Herein, Appellant states one issue for our review:

> I. Was the sentence of [five to thirteen] years of incarceration imposed by [the trial court] excessive and an abuse of discretion? Does this excessive sentence and abuse of discretion present a substantial issue since it exceeds even the aggravated range of the Sentencing Guidelines and [the court] expressly relied upon and justified exceeding the aggravated range with factual conclusions not supported by the jury's verdict?

Appellant's Brief at 12.

Appellant's issue challenges discretionary aspects of her sentence.

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. **Commonwealth v. Sierra**, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly

preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. *Commonwealth v. Mann*, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra, supra* at 912–13.

*Commonwealth v. Griffin*, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, Appellant filed a timely notice of appeal, and she preserved her sentencing challenge in a timely-filed, post-sentence motion. Appellant also included a Rule 2119(f) statement in her brief. *See* Appellant's Brief at 41-44. Therein, Appellant claims that her above-aggravated-range sentences for involuntary manslaughter and EWOC are manifestly excessive because they are premised on the court's erroneous conclusion that the jury found Appellant guilty of causing the injuries to E.Z., which resulted in his death. Appellant argues that the record does not support the court's interpretation of the jury's verdict. We conclude that Appellant has presented a substantial question for

our review. ***See Commonwealth v. Downing***, 990 A.2d 788, 792 (Pa. Super. 2010) (concluding that a claim the court considered an improper factor raises a substantial question for our review).

Thus, we now turn to the merits of Appellant's claim, mindful that,

> [s]entencing is vested in the discretion of the trial court, and will not be disturbed absent a manifest abuse of that discretion. An abuse of discretion involves a sentence which was manifestly unreasonable, or which resulted from partiality, prejudice, bias or ill will. It is more than just an error in judgment.

> A sentence is invalid if the record discloses that the sentencing court may have relied in whole or in part upon an impermissible consideration. This is so because the court violates the defendant's right to due process if, in deciding upon the sentence, it considers unreliable information, or information affecting the court's impartiality, or information that it is otherwise unfair to hold against the defendant. Simply put, the evidence upon which a sentencing court relies must be accurate, and there must be evidentiary proof of the factor, upon which the court relied.

***Id.*** at 792-93 (cleaned up).

Here, Appellant contends that the trial court erred by concluding that, in convicting her of involuntary manslaughter, the jury found that she shook E.Z., causing his fatal injuries. Appellant maintains that the record does not support the court's interpretation of the jury's verdict, because the jury was instructed that it could find her guilty of involuntary manslaughter based solely on her failure to seek medical treatment for E.Z. ***See*** Appellant's Brief at 52 (citing N.T. Trial, 10/4/19, at 827 (court's instructing jury that Appellant's "conduct does not have to be positive kind of action. A failure to act can be sufficient conduct as long as [Appellant] had a legal duty to act."); ***id.*** at 828 (court's instructing the jury that it "cannot find [Appellant] guilty of

involuntary manslaughter based on a failure to seek medical treatment for [the victim] unless you are satisfied beyond a reasonable doubt that [Appellant] had a legal duty to protect the health and safety of [the victim], that [Appellant] failed to perform that duty and that [Appellant's] failure was reckless or grossly negligent and was a direct cause of [the victim's] death")). Noting that she "never disputed her legal duty to care for the child," Appellant insists that "[i]t is entirely reasonable, and even plausible[,] to conclude that the jury found that [Appellant] failed to meet that duty, when it found [her] not guilty of murder in the third degree, but guilty of involuntary manslaughter." *Id.* In Appellant's view, the jury more likely found that her husband, Lee, was the person who injured E.Z., and that Appellant was guilty of involuntary manslaughter only because she failed to get E.Z. the medical treatment he required. Accordingly, she contends that the court erred by imposing above-aggravated-range sentences based on her not accepting responsibility, or showing remorse, for injuring the child, when the jury did not find her guilty of that conduct.

In rejecting Appellant's argument, the trial court explained:

> Appellant argues that the court's statement[s] at the time of sentencing[,] that Appellant refused to accept responsibility for causing E.Z.'s traumatic brain injury[,] is an impermissible factor to consider for the purposes of sentencing because the jury did not find Appellant caused E.Z.'s traumatic brain injury. Appellant's argument is a misinterpretation of the jury's verdict.

> Involuntary [m]anslaughter is a lesser included offense of [m]urder of the [t]hird [d]egree. *Commonwealth v. Davis*, 760 A.2d 406 (Pa. Super. 2000). Murder of the [t]hird [d]egree requires a finding of malice in addition to the same elements that

are contained in the offense of [i]nvoluntary [m]anslaughter. ***Commonwealth v. Packer***, 168 A.3d 161, 168 (Pa. 2017). Appellant's acquittal on the offense of [m]urder of the [t]hird [d]egree and the finding of guilt on the offense of [i]nvoluntary [m]anslaughter indicate that the jury could not find beyond a reasonable doubt that Appellant acted with malice. This is not equivalent to finding that Appellant did not cause E.Z.'s traumatic brain injuries. It is evidence that the jury found that Appellant's act in causing the brain injuries was not done with malice. Appellant's failure to seek medical attention for E.Z. after the trauma was inflicted was addressed by the jury when it found her guilty of EWOC.[2]

\*\*\*

[T]he court's consideration of Appellant's act in causing E.Z.'s injuries[,] and her inability to take responsibility[,] is not an irrelevant or impermissible factor, "such as [an appellant's] decision to stand trial rather than plead guilty, any prior constitutionally infirm convictions, [an appellant's] political ideology, [an appellant's] citizenship status, or unverified hearsay." ***Commonwealth v. Smithton***, 631 A.2d 1053, 1056-57 (Pa. Super. 1993).

Appellant stresses in her argument that she felt remorse for not taking E.Z. to the hospital sooner and stated her deep remorse to the court at the time of her sentencing. The court is free to evaluate Appellant's state of remorse, including her failure to take responsibility for causing E.Z.'s injuries. ***Commonwealth v. Brown***, 741 A.2d 726, 735 (Pa. Super. 1999), *appeal denied,* 790

---

[2] Appellant takes issue with this portion of the court's decision, stressing that the jury was not instructed that involuntary manslaughter is a lesser-included offense of third-degree murder, or that the EWOC charge had to be based on distinctly different conduct than the involuntary manslaughter conviction. ***See*** Appellant's Brief at 53-54. However, the jury was informed of the elements of third-degree murder and involuntary manslaughter; thus, it was aware that third-degree murder requires malice, while involuntary manslaughter does not. Accordingly, the court did not err by concluding that the jury knew it could convict Appellant of involuntary manslaughter based on a finding that Appellant inflicted the injuries to E.Z., but did so without malice, and find her guilty of EWOC for not seeking medical care for E.Z. after injuring him.

A.2d 1013 (Pa. 2001).[15]   In light of the evidence presented, the court gave little weight to Appellant's statements of remorse.

> [15] The jury was presented with evidence that E.Z was violently shaken[,] as evidenced by the findings at the time of his autopsy, and after the further expert examination of his eyes.   The evidence at trial included autopsy pictures showing the severe bruising to E.Z.'s head and the intercranial blood from the subdural hematoma.   These injuries would result in the near immediate loss of consciousness, and without immediate medical treatment would also result in death.   The chronology of events presented at the time of trial that was accepted by the jury is as follows: Appellant was alone with E.Z. from the time her children went to school at approximately 8:30 a.m.[,] until her husband returned home at approximately 3:00 p.m.   By Appellant's own admission, after she found E.Z. crying, he cried for 10-15 minutes.   He vomited and then became very tired and sleepy.   E.Z. continued in a state of unconsciousness, as a result of his brain injury, from the time she was alone with E.Z. … until one to two hours later when her husband returned home.

> We find that it was not improper or an abuse of discretion for this court to reference evidence that was produced at the time of trial and reflected in the verdict.   We also explained to Appellant that her sentence reflected E.Z.'s tender age, Appellant's responsibility for his safety, the circumstances of the offense, and the seriousness of the crime.   We find doing so is not an abuse of discretion….

TCO at 12-14 (some citations and one footnote omitted).

For the reasons proffered by the trial court, we agree that it did not abuse its discretion by considering that Appellant caused the injuries to E.Z. Appellant essentially asks us to conclude that the jury *acquitted her* of causing the injuries to E.Z., but that is not what occurred.   While the jury was instructed that it could find Appellant guilty of involuntary manslaughter based solely on her failure to seek medical care for E.Z., the jury was also instructed

- 10 -

that it could convict Appellant of that offense if it found she caused the injuries to E.Z., but did so without malice. The evidence presented to the jury provided more support for the latter conclusion, as Appellant herself admitted that she was alone with the child when he cried, vomited, and then lost consciousness. Thus, the record supports the court's determination that the jury's involuntary-manslaughter verdict was premised on Appellant's causing E.Z.'s injuries non-maliciously, and its EWOC verdict was based on her failure to seek medical care for the child after doing so. Accordingly, the court did not err by taking into account, for sentencing purposes, Appellant's failure to take responsibility for injuring E.Z., and her lack of remorse for doing so. In any event, the court also relied on other aggravating factors, such as the victim's age, Appellant's role as his caregiver, and the seriousness of the crime, in deciding that an above-aggravated-range sentence was warranted. For all of these reasons, Appellant has failed to convince us that the court abused its sentencing discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/05/2021

- 11 -