J-S19032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHANE BROLLY | : | |
| | : | |
| Appellant | : | No. 92 EDA 2025 |

Appeal from the PCRA Order Entered December 19, 2024
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0002526-2021

BEFORE: PANELLA, P.J.E., STABILE, J., and BECK, J.

MEMORANDUM BY BECK, J.: **FILED JULY 30, 2025**

Shane Brolly ("Brolly") appeals pro se from the order entered by the Bucks County Court of Common Pleas dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA").[1] Because we conclude that Brolly's claims lack merit, we affirm.

A prior panel of this Court summarized the facts and procedural history of this case as follows:

> On March 27, 2021, … [Brolly] borrowed his uncle's red GMC truck ("GMC") and picked up his friend, Eoin Quinn ("Quinn"), with a plan to spend the afternoon hitting golf balls at the Burlholme Golf Center ("Golf Center"), 401 Cottman Avenue, Philadelphia, Pennsylvania. N.T., 1/6/2022, at 27. On their way to the Golf Center, Brolly and Quinn stopped at Madonna's Beer Distributor in Montgomery County, Pennsylvania and purchased two (2) [twelve]-packs of seltzers [containing alcohol]. *Id.* at 27. The young men drank their seltzers for a few hours at the Golf Center.

_____

[1] 42 Pa.C.S. §§ 9541-9546.

*Id.* at 27-28. Next, [Brolly] and Quinn drove to a pub in Philadelphia, ate a meal, and consumed one Guinness beer each. *Id.* at 28. After finishing their food, [Brolly] and Quinn picked up a third friend, Matt Lawson ("Lawson"), and drove to Paddy Whacks Bar ("Paddy Whacks"), 9241 Roosevelt Boulevard, Philadelphia, Pennsylvania. *Id.* at 28. At this point, [Brolly] had been drinking alcohol for at least four (4) hours, and [l]aw [e]nforcement later discovered nineteen (19) empty seltzer cans in the GMC's backseat. *Id.* at 23-24.

On the way to Paddy Whacks, [Brolly] veered into the lane next to him and side-swiped a vehicle traveling in the same direction. *Id.* at 29. The two cars pulled over to the side of the road and [Brolly] offered to pay the driver $100.00 if he agreed not to report the accident. *Id.* This individual accepted the payment and drove away. *Id.* [Brolly], Quinn, and Lawson then resumed their journey to Paddy Whacks, pulling up at approximately 7:20 p.m. *Id.* [Brolly] had previously agreed to put the GMC's keys behind the bar when they arrived, but he never did. *Id.* at 28. About two and a half (2.5) hours later, after consuming another Guinness beer, several shots of liquor, mixed drinks, and one Corona beer, the bartender at Paddy Whacks cut [Brolly] off and refused to serve him. *Id.* at 30. This refusal agitated [Brolly], and he was asked to leave. *Id.* at 31.

Throughout the evening, Tiffany Zaborowski ("Zaborowski"), who did not know [Brolly] prior to this incident, had watched [him] struggle to walk, spill his drinks, and attempt to start an altercation when he was told to leave the bar. *Id.* As [Brolly], Lawson, and Quinn exited the bar, Zaborowski realized that [Brolly] planned to drive, and she followed them outside. *Id.* A complete stranger before that night, Zaborowski was so concerned about the danger of [Brolly] driving in his current state that she begged him not to get behind the wheel. *Id.* Lawson joined her, asking [Brolly] to spend the night at his house so he could drive home in the morning. *Id.* at 32. As their requests were ineffective, Zaborowski then pulled out her cell phone and offered to call [Brolly] an Uber rideshare driver, so [he] could get to his destination safely. *Id.* at 31. Again, [Brolly] refused. *Id.* Even as [Brolly] climbed into the GMC and started its engine, Zaborowski and Lawson stood outside the front passenger door, pleading with him. *Id.* at 32. They even tried to block Quinn from entering the GMC, begging him not to get in, but Quinn bolted

around them and hopped into the backseat on the driver's side. ***Id.***

As Zaborowski pled with [Brolly] in the Paddy Whacks parking lot, four (4) young women[, J.A., J.M., A.C., and T.D.,] piled into J.A.'s Mazda SUV ("Mazda") and started their journey to T.D.'s home for a sleepover. [***Id.*** at] 22. … As they traveled south on [Bridgetown Pike, Brolly] was driving northbound on [the same road]. ***Id.*** at 23-24. [Brolly] drove up behind a Nissan Murano ("Nissan") … and decided to try and pass [it]. ***Id.*** at 23. [Brolly] accelerated and swerved the GMC into the southbound lane of oncoming traffic to pass the Nissan. ***Id.*** at 23-24. At a speed of approximately seventy (70) miles per hour, [Brolly] drove head on into the oncoming Mazda, stopping it dead in its tracks. ***Id.*** at 34. … Crash Reconstruction Expert Chief Steve Mawhinney ("Chief Mawhinney") was able to determine from the GMC's event data recorder that [Brolly] never hit the brake[s]. [***Id.***] at 33. In fact, [Brolly] did not take his foot off the gas pedal until one (1) second before he made impact, hitting the Mazda with such force that it was violently thrown backward off the roadway, where it rolled before reaching its final resting place. ***Id.*** at 34. As the Mazda rolled, [Brolly]'s GMC shot skyward before slamming directly atop the Nissan he had tried to pass. ***Id.*** at 24.

Immediately after the crash, … Michael [Lohin ("Lohin"), who lived nearby,] rushed to the scene to assess the damage. ***Id.*** [at 19]. [Lohin] saw the Mazda's engine engulfed in flames and he ran inside [his home] to retrieve his fire extinguisher. ***Id.*** As he and his neighbor, Eli Bielawksy … put the fire out, … [Lohin] removed the Mazda's sunroof and [began attempting to extricate the girls from the vehicle. Emergency personnel then arrived at the scene. ***Id.*** at 19-21.] …

As [Lohin and] a throng of workers did what they could for the girls [in the Mazda], [Lohin] observed [Brolly] and Quinn laying shirtless on their backs near the scene of the accident. ***Id.*** at 22. As he approached, [Lohin] could smell the odor of alcohol emanating from them, even from a distance. ***Id.*** [Officer Timothy Friel of the Northampton Township Police Department] also later reported that he detected an odor of alcohol on [Brolly]'s breath. ***Id.*** [Brolly] was transported to St. Mary Medical Center, 1201 Langhorne Newtown Road, Langhorne, Bucks County, Pennsylvania ("St. Mary's") for medical treatment, where hospital staff took numerous vials of blood and sent them to a lab for

testing. *Id.* at 25. Law [e]nforcement obtained [Brolly]'s toxicology report pursuant to a search warrant, which indicated that [he] had a Blood Alcohol Concentration ("BAC") of .211 g/100 mL. *Id.* at 26.

The young women in the Mazda suffered extensive and life-threatening injuries.[2] *Id.* J.A. suffered from a closed mandibular jaw fracture and deep lacerations to her face, cheek, and lip. *Id.* at 37. She had an open right femoral shaft fracture, an open right patella fracture, an upper rib fracture, a left wrist fracture, ligamentous injuries to her left knee, PCL and LCL injuries, and significant bruising to her extremities. *Id.* at 37-38. … J.A.'s jaw fracture was surgically closed using screws, plates, and arch bars, and she had to have a second surgery in April of 2021 to remove the bars. *Id.* [at 37]. In December of 2021, J.A. underwent a third surgery, a bone graft, to treat her right femoral shaft fracture that had not properly healed. *Id.* J.A. suffered permanent scarring to her face, left hand, right leg, pelvis, and hip. *Id.* at 38.

T.D. … suffered from multiple blunt trauma injuries with lacerations to her lower abdomen, groin, and face. *Id.* at 38-39. She had a gross deformity and closed fracture of the left humorous bone in her arm and a closed fracture of the left femur, which required surgery and placement of pins and rods. *Id.* at 39. T.D. also suffered from a ten-centimeter laceration over her left knee with exposed bone, a fractured left ankle, a bowel perforation which required abdominal surgery, and a small bowel resection. *Id.*

… J.M.'s injuries included a concussion, edema of the thoracic spinal cord, multiple fractured ribs, a fractured nasal bone, a fractured right side orbital bone, a traumatic brain injury, multiple lacerations on her head, shoulder, neck, and face, multiple abrasions, numerous contusions, and three fractured vertebrae (T6, T7, and T8), which required surgical repair via laminectomy and fusion. *Id.* at 39-40. Her face is permanently scarred. *Id.* at 41. A.C. … receive[d] treatment for a traumatic brain injury, a nasal bone fracture, broken thumb, fractured right forearm, a vitreous detachment in her right eye, multiple contusions, and a lacerated spleen. *Id.* Quinn was also

_____

[2] Fortunately, the occupants of the Nissan did not suffer serious injuries.

significantly injured in the crash. He was treated … for a traumatic abdominal hernia, left apical pneumothorax, a perforated bowel, and a lacerated colon. ***Id.***

… On January 6, 2022, [Brolly pled guilty to eight counts of recklessly endangering another person; five counts each of aggravated assault, aggravated assault by vehicle, aggravated assault by vehicle while driving under the influence (DUI); and one count each of accidents involving death or serious bodily injury, DUI – general impairment, DUI – highest rate of alcohol, driving at an unsafe speed, reckless driving, and disregard of traffic lanes]. The trial court ordered the preparation of a pre-sentence investigation report (PSI).

On May 19, 2022, the trial court sentenced [Brolly], within the standard range of the sentencing guidelines, to an aggregate [fifteen] years and [three] days [to thirty] years and [six] months in prison. The sentence was less than the sentence recommended in [Brolly]'s PSI. Notably, the trial court ordered the sentences for [the] five … aggravated assault convictions to run consecutively.

***Commonwealth v. Brolly***, 2720 EDA 2022, 2023 WL 3644379, at *1-3 (Pa. Super. May 25, 2023) (non-precedential decision) (quoting Trial Court Opinion, 12/7/2022, at 1-6) (record citations modified, original brackets omitted, footnote added).

On May 25, 2023, this Court affirmed Brolly's judgment of sentence. ***See id.*** He did not file a petition for allowance of appeal to the Pennsylvania Supreme Court.

On September 19, 2023, Brolly filed a timely pro se PCRA petition and the PCRA court appointed counsel. Brolly subsequently requested to proceed

pro se, and following a **Grazier**[3] hearing, the PCRA court permitted Brolly's

counsel to withdraw and directed Brolly to file an amended PCRA petition. On

March 14, 2024, Brolly filed his amended petition. The PCRA court scheduled

a hearing on Brolly's petition for September 6, 2024. On August 23, 2024,

Brolly filed a motion for a continuance of the hearing on his PCRA petition.

The PCRA court subsequently granted a continuance and rescheduled his

hearing for December 16, 2024. At the December 16, 2024 hearing, Brolly

requested a second continuance, which the PCRA court denied. On December

19, 2024, the PCRA court entered an order denying the petition.

Brolly timely appealed to this Court. Both Brolly and the PCRA court

have complied with Pennsylvania Rule of Appellate Procedure 1925. Brolly

presents the following issues for review:

> 1. Did the PCRA court err in dismissing [Brolly]'s pro se amended
> PCRA [petition] by failing to find that plea counsel rendered
> ineffective assistance for failing to file a pretrial motion for the
> suppression of [Brolly]'s [BAC] test results where … "the
> emergency room physician or his designee" who, after performing
> a warrantless blood draw on March 27, 2021 pursuant to 75
> Pa.C.S. § 3755(a) where exigent circumstances existed, failed to
> "transmit" the blood sample "within twenty-four hours" to "the
> Department of Health or a clinical laboratory licensed and
> approved by the Department of Health" and, after accepting a
> preservation letter from police, held and stored the untested
> warrantless blood draw until March 29, 2021 when police seized it
> via search warrant then held the specimen in police custody until
> April 1, 2021 when the clinical laboratory licensed and approved
> by the Department of Health known as NMS Labs took physical
> custody of the specimen from the police evidence refrigerator and
> then, five days after it was drawn, finally transmitted it to their

_____

[3] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

lab for testing in violation of 75 Pa.C.S. § 3755(a) thereby resulting in [Brolly]'s guilty plea to the DUI and DUI related charges not being knowingly and intelligently entered?

2. Did the PCRA court err in dismissing [Brolly]'s pro se amended PCRA [petition] by failing to find that plea counsel rendered ineffective assistance where [Brolly]'s guilty plea to five counts of aggravated assault w/intent to cause serious bodily injury under 18 Pa.C.S. § 2702(a)(1) was not entered knowingly and intelligently due to plea counsel advising [Brolly] on the element of ordinary recklessness, but failed to advise [Brolly] on the recklessness that equates to the malice intent element required to secure a conviction for felony 1 aggravated assault under Title 18 in the DUI context where a muti-vehicle accident occurred that resulted in the serious bodily injury of those involved[,] including [Brolly,] and the plea [counsel]'s instruction on the recklessness element of subsection 2702(a)(1) did not meet the intent definition of "the functional equivalent of murder in which, for some reason, death fails to occur" as initially espoused by the Pennsylvania Supreme Court in *Commonwealth v. O'Hanlon*, 653 A.2d 616 (Pa. 1995)?

3. Did the PCRA court err in dismissing [Brolly]'s pro se amended PCRA [petition] where the PCRA court denied a continuance request and failed to find exceptional circumstances existed to grant discovery pursuant 42 Pa.C.S. 9545(d)(2)[,] which resulted in phone records [Brolly] attempted to secure via subpoena that would prove plea counsel gave [Brolly] legally deficient advice concerning the length and concurrence of the sentence [Brolly] would get in exchange for a plea of guilty to the highest graded charges not being preserved in the record for the PCRA court to properly determine whether or not [Brolly]'s guilty plea was entered knowingly and intelligently as to claim #2 (two) of the amended PCRA?

Brolly's Brief at 1-2 (typographical errors corrected).

"We review the denial of PCRA relief by examining whether the PCRA court's conclusions are supported by the record and free from legal error." *Commonwealth v. Johnson*, 289 A.3d 959, 979 (Pa. 2023). "[W]e defer to the factual findings of the post-conviction court, which is tasked with hearing

- 7 -

the evidence and assessing credibility. *Id.* Our standard of review of a PCRA court's legal conclusions, however, is de novo. *Id.*

Brolly's first two issues present claims of ineffective assistance of counsel related to the validity of his guilty plea.

> It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Commonwealth v. Reid*, 259 A.3d 395, 405 (Pa. 2021) (quotation marks and citation omitted). Importantly, a PCRA petitioner must address each of these three prongs on appeal, as the petitioner bears the burden of pleading that counsel provided ineffective assistance. *Id.* This Court, however, need not review claims of ineffective assistance of counsel in any particular order, as the law is clear that "[a] petitioner's failure to satisfy any prong of this test is fatal to the claim." *Id.*

Ineffective assistance of counsel claims related to the guilty plea process are cognizable under the PCRA. *Commonwealth v. Barndt*, 74 A.3d 185, 191-92 (Pa. Super. 2013) (citing 42 Pa.C.S. § 9543(a)(2)(ii)). A criminal defendant has the right to effective assistance of counsel in deciding whether to plead guilty. *Commonwealth v. Velazquez*, 216 A.3d 1146, 1149 (Pa. Super. 2019). An allegation of ineffective assistance of counsel in connection

with the entry of a guilty plea serves as a basis for PCRA relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea. *Id.* "Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* at 1149-50 (citation omitted).

> The standard for post-sentence withdrawal of guilty pleas dovetails with the arguable merit/prejudice requirements for relief based on a claim of ineffective assistance of plea counsel, … under which the defendant must show that counsel's deficient stewardship resulted in a manifest injustice, for example, by facilitating entry of an unknowing, involuntary, or unintelligent plea. This standard is equivalent to the "manifest injustice" standard applicable to all post-sentence motions to withdraw a guilty plea.

*Commonwealth v. Kelley*, 136 A.3d 1007, 1013 (Pa. Super. 2016) (citation omitted). "In determining whether a plea is valid, the court must examine the totality of circumstances surrounding the plea." *Commonwealth v. Dinell*, 270 A.3d 530, 533 (Pa. Super. 2022) (citation omitted).

In his first issue, Brolly argues that the PCRA court erred in denying his claim that plea counsel was ineffective for declining to pursue a motion to suppress the results of his warrantless blood draw, which he claims violated his rights under the Fourth Amendment to the United States Constitution. Brolly's Brief at 10-16. He asserts that his blood draw was illegal because the hospital did not conduct the blood draw for independent medical purposes, but rather did so at the direction of police, pursuant to 75 Pa.C.S. § 3755,

without police obtaining a warrant for a blood draw. *Id.* at 11-15. Brolly further asserts that the blood draw did not comply with the mandates of section 3755(a) because the hospital did not transfer his blood sample to the Department of Health or an accredited lab within twenty-four hours of conducting the blood draw. *Id.* at 12-13. Additionally, he maintains that had plea counsel advised him that his blood draw was illegal, he would not have pled guilty. *Id.* at 15-16.

We begin by emphasizing that "[a] defendant is bound by statements made during a plea colloquy and a defendant may not later offer reasons for withdrawing the plea that contradicts the statements he made when he pled." *Commonwealth v. Kapellusch*, 323 A.3d 837, 848 (Pa. Super. 2024) (citation omitted); *see also Commonwealth v. Pier*, 182 A.3d 476, 480 (Pa. Super. 2018) ("[a] person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy"). Brolly affirmed in his written guilty plea colloquy and orally at his guilty plea hearing that he understood that by pleading guilty, he was giving up his right to litigate pretrial motions, including suppression motions, that he was guilty of all the crimes to which he was pleading, that he wanted to plead guilty, and that he was satisfied with plea counsel's representation. *See* N.T., 1/6/2022, at 5-10, 44; Written Plea Colloquy, 1/4/2022, ¶¶ 15, 26, 30, 33. On this basis alone, Brolly is not entitled to relief

on his challenge to plea counsel's alleged ineffective assistance in declining to pursue a suppression motion. *See Commonwealth v. Singleton*, 169 A.3d 79, 80-81 (Pa. Super. 2017) (reiterating the principle that by entering a guilty plea, a defendant waives all non-jurisdictional defects and defenses and his right to challenge anything but the legality of the sentence and the validity of the plea); *see also Commonwealth v. Johnson*, 179 A.3d 1153, 1160 (Pa. Super. 2018) ("[T]he decision to litigate, or not litigate, suppression motions is left to counsel in the exercise of his or her professional judgment. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Moreover, even if Brolly's representations to the trial court during his plea colloquy did not preclude him from challenging the validity of his plea based on counsel's decision not to pursue a suppression motion, the claim lacks merit. The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.[4] *Int. of T.W.*, 261 A.3d 409, 416 (Pa. 2021). "It has long been established that a blood draw for

---

[4] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularity describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

purposes of determining BAC constitutes a search under the Fourth Amendment." ***Commonwealth v. Bell***, 211 A.3d 761, 769 (Pa. 2019). It is also well settled that "[a] search or seizure conducted without a warrant is presumptively unreasonable … subject to a few specifically established, well-delineated exceptions." ***Commonwealth v. Jones-Williams***, 279 A.3d 508, 515 (Pa. 2022) (quotation marks and citation omitted).

Previously, one such exception to the warrant requirement as it pertains to blood draws was section 3755 of the Vehicle Code.[5] Section 3755(a) required "hospital personnel, in cases where probable cause exists to believe

_____

[5] Section 3755(a) provided:

> If, as a result of a motor vehicle accident, the person who drove, operated or was in actual physical control of the movement of any involved motor vehicle requires medical treatment in an emergency room of a hospital and if probable cause exists to believe a violation of section 3802 (relating to driving under influence of alcohol or controlled substance) was involved, the emergency room physician or his designee shall promptly take blood samples from those persons and transmit them within 24 hours for testing to the Department of Health or a clinical laboratory licensed and approved by the Department of Health and specifically designated for this purpose. This section shall be applicable to all injured occupants who were capable of motor vehicle operation if the operator or person in actual physical control of the movement of the motor vehicle cannot be determined. Test results shall be released upon request of the person tested, his attorney, his physician or governmental officials or agencies.

75 Pa.C.S. § 3755(a). During the pendency of this appeal, our Supreme Court held that section 3755 is unconstitutional. ***See Commonwealth v. Hunte***, ___ A.3d ___, 2025 WL 1703981 (Pa. 2025). This determination, however, does not impact our resolution of this matter.

that an emergency room patient has violated Pennsylvania's DUI statute, to take blood samples for BAC testing." ***Commonwealth v. Shaw***, 770 A.2d 295, 298 (Pa. 2001). In ***Shaw***, our Supreme Court held that, where hospital personnel conduct a BAC test for independent medical purposes, i.e., not at the request of law enforcement, the blood test did not occur pursuant to section 3755. ***Id.*** at 299. Additionally, more recently, our Supreme Court held that in conducting a blood draw, if there is no evidence that hospital personnel acted at the direction of police or as an agent of the police, and instead, conducted the blood draw for "independent medical purposes," the blood draw did not trigger the protections of the Fourth Amendment to the United States Constitution. ***Jones-Williams***, 279 A.3d at 515, 519-21.

The record reflects that on the night of the accident, while Brolly was receiving treatment for his injuries at the hospital, police observed hospital personnel draw several vials of his blood. N.T., 1/6/2022, at 25. Shortly thereafter, police provided a letter advising the hospital of their intention to seek a search warrant so that police could obtain a sample of Brolly's blood for BAC testing. Commonwealth's Motion for Disposition Without a Hearing, 3/25/2024, at 11 n.3. Two days after the accident, police procured a search warrant to obtain a sample of Brolly's blood for BAC testing. N.T., 1/6/2022, at 25-26.

Significantly, Brolly points to nothing in the record that would support his claim that his blood draw occurred at the direction of police or pursuant to

section 3755. *See* Brolly's Brief at 10-16. Likewise, our review of the record uncovered no evidence that indicated that the hospital drew Brolly's blood for anything other than independent medical purposes.

As there was no evidence to suggest that Brolly's blood draw occurred for any reason other than independent medical purposes, the Commonwealth had no obligation to prove that the hospital drew his blood for independent medical purposes. *Commonwealth v. Miller*, 996 A.2d 508, 515 (Pa. Super. 2010) (en banc). Because the hospital conducted the blood draw for independent medical purposes, and police obtained the results of this blood draw after applying for and executing a valid search warrant, the results of the blood draw were admissible in Brolly's DUI prosecution. *See id.* at 513, 515. Thus, even if trial counsel had filed a motion to suppress the results of Brolly's blood draw, it would not have been successful, and the outcome of the proceedings would not have been any different. *See Reid*, 259 A.3d at 405. The PCRA court therefore did not err in denying Brolly's claim that plea counsel was ineffective for failing to pursue a suppression motion and concluding that counsel's alleged shortcoming in this respect did not result in an involuntary guilty plea. *See Kelley*, 136 A.3d at 1013.[6]

_____

[6] Additionally, we note that had Brolly successfully suppressed the results of his blood draw, it only would have affected his DUI – highest rate of alcohol charge, as that is the only conviction that required evidence of his BAC. *See* 75 Pa.C.S. § 3802(c). As the facts of this case demonstrate, there was ample
*(Footnote Continued Next Page)*

- 14 -

In his second issue, Brolly argues that the PCRA court erred in dismissing his claim that his plea was not knowing, voluntary, and intelligent, because neither plea counsel nor the trial court advised him of all the elements of aggravated assault. Brolly's Brief at 16-23. Specifically, he contends that both plea counsel and the trial court failed to advise him regarding the element of malice, which section 2702(a)(1) of the Crimes Code[7] requires to sustain a conviction of aggravated assault. *Id.* Brolly maintains that if either plea counsel or the trial court made him aware of the nature of the malice requirement, he would not have pled guilty because the facts of the case do not support the finding that he acted with malice. *Id.*

"A valid plea colloquy must delve into six areas: 1) the nature of the charges, 2) the factual basis of the plea, 3) the right to a jury trial, 4) the presumption of innocence, 5) the sentencing ranges, and 6) the plea court's power to deviate from any recommended sentence." *Commonwealth v.*

_____

evidence available from patrons of Paddy Whacks, Lohin, and first responders that indicated that Brolly operated a vehicle while heavily intoxicated.

[7] Under section 2702(a)(1), "[a] person is guilty of aggravated assault if he … attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702(a)(1). Malice, which is the mens rea required for a conviction of aggravated assault, "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017).

*Reid*, 117 A.3d 777, 782 (Pa. Super. 2015) (quotation marks and citation omitted). "Furthermore, nothing in [Pennsylvania Rule of Criminal Procedure 590] precludes the supplementation of the oral colloquy by a written colloquy that is read, completed[,] and signed by the defendant and made a part of the plea proceedings." *Commonwealth v. Bedell*, 954 A.2d 1209, 1212-13 (Pa. Super. 2008); *see also* Pa.R.Crim.P. 590, cmt. "[T]he law does not require that a defendant be pleased with the outcome of his decision to plead guilty. The law requires only that a defendant's decision to plead guilty be made knowingly, voluntarily, and intelligently." *Commonwealth v. Jabbie*, 200 A.3d 500, 506 (Pa. Super. 2018).

The record belies Brolly's claim. At the PCRA hearing, plea counsel testified that he understood that the aggravated assault charges were Brolly's "main concern" and that plea counsel discussed with Brolly all the elements of aggravated assault, that he went through the written plea colloquy with Brolly line by line, and that Brolly did not ask him any questions related to the elements of aggravated assault. *See* N.T., 12/16/2024, at 20-26. The PCRA court credited plea counsel's testimony and we are bound by the determination. *See* PCRA Court Opinion, 3/7/2025, at 6-7; *see also Kapellusch*, 323 A.3d at 844 ("a reviewing court is bound by a PCRA court's credibility determinations and its fact-finding, so long as those conclusions are supported by the record"). Furthermore, the record reflects that the trial court

also advised Brolly on the elements of aggravated assault during the plea colloquy. *See* N.T., 1/6/2022, at 13.

We reiterate that, as Brolly indicated in both is oral and written colloquies that he understood the nature of the charges against him, including the elements of aggravated assault, he is bound by the statements he made in court while under oath. *See Kapellusch*, 323 A.3d at 848; *Pier*, 182 A.3d at 480; *see also* N.T., 1/6/2022, at 13-14; Written Plea Colloquy, 1/4/2022, ¶ 14. As the record amply reflects that Brolly was fully aware of all the elements of aggravated assault when he pled guilty, we conclude that the PCRA court did not err in dismissing his claim that his guilty plea was not knowing, voluntary, and intelligent.

For his final issue, Brolly argues that the PCRA court erred in denying his request to compel the Commonwealth to produce evidence of recorded phone calls that he allegedly had with plea counsel while he was in prison that occurred prior to his guilty plea. Brolly's Brief at 23-30. Brolly maintains that these phone calls would reveal that plea counsel promised Brolly that he would receive a sentence of five to ten years in prison if he pled guilty. *Id.* Additionally, Brolly asserts that the PCRA court erred in denying his request for a second continuance when he requested additional time at his December 16, 2024 PCRA hearing to obtain evidence of these phone calls. *Id.*

Pennsylvania Rule of Criminal Procedure 902(E) governs discovery requests in PCRA proceedings and provides that "no discovery shall be

permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances." Pa.R.Crim.P. 903(E). Our Supreme Court has observed that "the phrase 'exceptional circumstances' is not defined by either the PCRA statute or the criminal rules of procedure, and it is up to the PCRA court, in its discretion, to determine if exceptional circumstances exist and discovery is warranted." ***Commonwealth v. Wharton***, 263 A.3d 561, 572-73 (Pa. 2021). Here, Brolly has failed to set forth what exceptional circumstances, if any, existed that demonstrated discovery was warranted in this case. ***See*** Brolly's Brief at 23-30. On this basis alone, Brolly is not entitled to relief on his claim that the PCRA court erred in denying his request for discovery. ***See*** Pa.R.Crim.P. 902(E).

Moreover, we point out that the phone recordings that Brolly seeks are of phone calls that allegedly occurred while Brolly was incarcerated, and thus, it is the prison, and not the Commonwealth, who would be in possession of the phone recordings. Brolly has offered no explanation as to why he could not procure the phone recordings nor has he established that the Commonwealth was in possession of the recordings. Thus, the PCRA court did not err in denying Brolly's discovery request. ***See Commonwealth v. Santos***, 176 A.3d 877, 883 (Pa. Super. 2017) (stating that "where the evidence is equally accessible or inaccessible to both the Commonwealth and the defense, the defense cannot use the discovery rules against the Commonwealth for its failure to produce the evidence").

With respect to Brolly's claim that the PCRA court erred by denying his request for a second continuance to obtain the phone recordings, we observe the following:

> A motion for continuance on behalf of the defendant shall be made not later than 48 hours before the time set for the proceeding. A later motion shall be entertained only when the opportunity therefor did not previously exist, or the defendant was not aware of the grounds for the motion, or the interests of justice require it.

Pa.R.Crim.P. 106(D).

The record reflects that the PCRA court initially scheduled the hearing on Brolly's PCRA petition for September 6, 2024, and that he filed a motion for a continuance on August 23, 2024, on the basis that he was unable to successfully subpoena the prison for the alleged phone recordings at issue. *See* Motion for Continuance, 8/23/2024. The PCRA court granted the continuance and rescheduled the hearing for December 16, 2024. *See* N.T., 9/6/2024, at 8. At the December 16, 2024 hearing, Brolly once again requested a continuance on the basis that he was unable to obtain the alleged phone recordings. *See* N.T., 12/16/2024, at 7. Brolly, however, indicated that he was fully aware of this issue well in advance of the December 16, 2024 hearing, but did not seek a continuance until the time set for the hearing. *See id.* As Brolly did not make his second request for a continuance more than forty-eight hours before the time set for the proceeding, we conclude that the

PCRA court did not err in denying his request for a continuance. ***See***

Pa.R.Crim. 106(D).[8]

As each of the issues Brolly has raised for review lack merit, we conclude

that the PCRA court did not err in denying his PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/30/2025

_____

[8] Additionally, we note that the trial court informed Brolly of his maximum possible sentence at the guilty plea hearing and he indicated to the court that he understood the length of his maximum possible sentence. N.T., 1/6/2022, at 14-18.