J-A23013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY MONTEL HAIRSTON | : | |
| | : | |
| Appellant | : | No. 237 WDA 2025 |

Appeal from the Judgment of Sentence Entered January 31, 2025
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s):  CP-65-CR-0001618-2022

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:            **FILED: December 10, 2025**

Anthony Montell Hairston appeals from the judgment of sentence entered in the Court of Common Pleas of Westmoreland County after his conviction of third-degree murder and other criminal offenses. Hairston challenges the sufficiency of the evidence and claims the trial court abused its discretion in admitting evidence under Pennsylvania Rule of Evidence 404(b). After careful review, we affirm.

We glean the following factual and procedural history from the certified record. On December 31, 2021, Holly Vadella celebrated New Years Eve with her mother, Dolores Coulson, at her mother's house. Around 1:30 a.m. on January 1, 2022, Vadella left her mother's house. At approximately 1:40 a.m., Officer Brian Dove observed Vadella's vehicle sitting on the side of the roadway with its headlights on heading north on Route 201. Vadella was found deceased in the driver's seat.

A later autopsy revealed that Vadella was killed by a single gunshot that entered her left torso and exited her right torso from a slightly higher elevation to a slightly lower one. Two fired bullets were found; a mutilated one in the area of the driver's window and the other within Vadella's clothing. However, shell casings were not found. It was determined that the bullet caliber was 9mm. Based on the crime scene, the investigating officers believed that Vadella was shot from within a passing vehicle.

On the same day, investigating officers began retrieving surveillance videos from residences and businesses along Route 201. One video showed Vadella's vehicle being tailgated by a small white SUV with a black stripe at the bottom. Audio from one video at 1:34 a.m. was indicative of an engine accelerating and then two loud gunshot-like bangs. Video from Sweeny's Bar, in Belle Vernon, showed a white SUV entering the parking lot at 1:36 a.m. and four individuals getting out of the vehicle and going inside. These four individuals were identified by the owner of Sweeny's as Hairston, Shaquala Poole, Bianca Love, and Yasmine Taylor.

The next day, the officers successfully located all four individuals. Love and Taylor both gave statements that day as to what happened. Officers surveilled Hairston's residence in Belle Vernon and observed him enter the white Chevy Traverse, which was determined to be owned by Poole, and leave his home around 12:30 p.m. Officers initiated a traffic stop and took Hairston into custody. Around 1:30 p.m., Poole was observed arriving at Hairston's

residence and she was interviewed. Poole was Hairston's girlfriend, they had one child together, and Poole frequently stayed at Hairston's residence.

On January 3, 2022, police searched Hairston's residence. Notably, police found a Glock 26 pistol that was 9mm caliber inside a children's backpack, drugs and drug paraphernalia, firearm ammunition, and $2,720 in US currency. Thereafter, Hairston was charged via criminal information with: (1) Criminal Homicide, 18 Pa.C.S.A. § 2501(a); (2) Person Not to Possess Firearms (F1), 18 Pa.C.S.A. § 6105(a)(1); (3) Person Not to Possess Firearms (F2), 18 Pa.C.S.A. § 6105(a)(1); (4) Driving Under Suspension—DUI Related, 75 Pa.C.S.A. § 1543(b)(1)(i); (5) Tampering with Evidence, 18 Pa.C.S.A. § 4910(1); (6) Criminal Conspiracy—Tampering with Evidence, 18 Pa.C.S.A. § 903(a)(1); (7) Possession with Intent to Deliver a Controlled Substance, 35 P.S. § 780-113(a)(30); and (8) Possession of a Controlled Substance, 35 P.S. § 780-113(a)(16).

A couple months before trial, one of the investigating detectives was informed of a Facebook post made on Hairston's profile on August 17, 2024. At that time Hairston was incarcerated. The Facebook post read:

> "Black and white don't lie. This shit get deep, period. Trial comin(sic) up" followed by an emoji of an alarm clock. "I'm ten toes down already." Followed next by two emojis of two padlocks. Below the post, were two images of transcripts from an interview between Westmoreland County Detectives and Shaquala Poole on January 7, 2022, which would have been the second time police interviewed her.

Trial Court Opinion, 4/17/25, at 8. Additionally, there was a recorded jail phone call between Hairston and Aimee Miller where Hairston directed Miller to make the Facebook post.[1] The Commonwealth filed a motion to admit this evidence and on October 22, 2024, the trial court heard argument. The trial court took the matter under advisement. At the start of jury selection, the trial court granted the Commonwealth's motion.

On November 4, 2024, a four-day jury trial commenced. Counts 4, 6, and 8 were dismissed prior to reaching the jury. The jury convicted Hairston of all remining counts, finding him guilty at Count 1 of third-degree murder. On January 31, 2025, Hairston was sentenced to an aggregate term of 40 to 80 years' incarceration followed by four years of probation. Hairston timely appealed. Both Hairston and the trial court complied with Pa.R.A.P. 1925.[2] *See* Pa.R.A.P. 1925(a)-(b).

Hairston raises the following issues on appeal.

1. Whether [Hairston's] convictions at Counts 1, 2, and 3 were based on sufficient evidence?

2. Whether the trial court erred in permitting the Commonwealth to introduce purported evidence of [Hairston's] efforts to

---

[1] The Commonwealth charged Hairston and Miller with intimidating a witness, retaliation against a witness, and conspiracy to commit both offenses. *See* Docket Sheet, Docket No. CP-65-CR-0004305-2024; Docket Sheet, Docket No. CP-65-CR-0004306-2024. Their trial is currently scheduled for January 5, 2026.

[2] The Honorable President Judge Christopher A. Feliciani presided over the pretrial proceedings, the trial, and sentencing. The Honorable Judge Michael J. Stewart II authored the trial court's 1925(a) opinion.

intimidate witness Shaquala Poole when the content of the messages were indistinct, did not fall into a delineated 404(b) exception, and were overtly prejudicial to [Hairston]?

Appellant's Brief, at 2.

Hairston's first issue challenges the sufficiency of the evidence to support his conviction of third-degree murder and person not to possess a firearm.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Demulter*, 314 A.3d 934, 937 (Pa. Super. 2024), *appeal denied*, 325 A.3d 452 (Pa. 2024) (citation omitted).

Hairston argues that the Commonwealth presented insufficient evidence that he fired the shots that killed Vadella. **See** Appellant's Brief, at 13, 17-18, 22-23. He claims the evidence was insufficient because Poole, Love, and Taylor were unreliable since they were intoxicated and lacked credibility

because they were motivated to place the blame on Hairston, Poole's DNA was also on the firearm, and Poole was in the position (front passenger seat) most capable of shooting at Vadella. *See id.* The Commonwealth argues that it presented both physical evidence and eyewitness testimony that was sufficient to establish that Hairston possessed the firearm and used it to shoot and kill Vadella. *See* Appellee's Brief, at 1-4. The Commonwealth asserts that Hairston's attempt to redirect blame to Poole amounts to challenging the credibility determinations that were solely within the jury's purview. *See id.* at 3-4.

The Commonwealth presented ample evidence to establish that Hairston shot and killed Vadella, and the trial court provided a detailed summation of that evidence.

> The [c]ourt finds that from the time [Vadella's] body was discovered along the roadway, neighboring police departments and the Westmoreland County Detectives worked together to gather all relevant evidence to determine the manner in which [Vadella] was killed. The Commonwealth presented evidence, following an autopsy, that [Vadella] suffered "two defects on her body, one on her left upper chest and one right behind her armpit that ultimately were determined to be gunshot wounds." As a result of those gunshot wounds, [Vadella] was killed and the manner of death was determined to be homicide.
>
> The investigation of [Vadella's] vehicle revealed blood on the driver's seat, the driver's side window was shattered and missing, there was a hole in the mirror cap on the driver's side door, and defects in the driver's side door swipe all caused by the two bullets that were shot. The evidence indicated that [the] bullet path came from the front to rear and from a slightly higher elevation to a slightly lower elevation. The evidence presented at trial confirmed that the white Chevy Traverse was slightly higher than [Vadella's] vehicle. The Traverse was moving to the left of

[Vadella's] vehicle, to pass her since she was driving slowly, which is consistent with the evidence presented about [the] direction the bullets traveled.

Next the officers conducted a search at [Hairston's] home. While surveilling his home, Ms. Poole attempted to vacate the residence with a bag that contained the Glock 26 pistol believed to be involved in the death of [Vadella]. And, although the gun was originally found in the possession of Ms. Poole, the jury heard testimony that she received a call from [Hairston] wherein he informed her that he was being taken into custody and she next received a call from [Hairston's] father that caused her to attempt to take the gun, drugs, and drug paraphernalia out of [Hairston's] home. Detective Dupilka confirmed [Hairston] made a phone call when he was stopped by the police. There was further testimony, that in the past, [Hairston] was known to be in possession of the gun found in Ms. Poole's bag.

The testimony of Ms. Poole, Ms. Love and Ms. Taylor was consistent that they and [Hairston] had been drinking and partying on New Year's Eve. They all decided to head to Sweeney's bar after midnight to continue their celebration. All three women described themselves as being overly intoxicated. Because of that, they all agreed that [Hairston] drove the vehicle and that Ms. Poole was seated in the front passenger side of the vehicle; while[] Ms. Love and Ms. Taylor rode in the back seat. They all stated that [Vadella's] vehicle was moving slowly and [Hairston] began to pass her on the left. Although the three women differ slightly in their recollections of seeing [Hairston] actually take out the gun, all three testified that they believe [Hairston] opened the front passenger window in the Travers[e] and [Hairston] fired the gun twice, through that window. There was testimony that Ms. Poole said either "What the Fuck" or she asked why he would do that. All three indicated that they were unaware that someone had been killed. Thereafter, the four went to Sweeney's bar to resume their festivities.

Video and audio footage that was gathered from nearby homes and businesses confirmed that the Traverse was following [Vadella's] vehicle and then began to pass her on the left. The two gun shots could be heard on the retrieved footage after hearing [Hairston] revving up the engine. The distance between the location of the shooting and Sweeney's bar was reasonably consistent with the amount of time it would take for the Traverse

to reach the bar after the shots were fired. And, the Commonwealth presented evidence that [Hairston's] DNA was found on the gun.

In summation, in conjunction with all of the other evidence presented by the Commonwealth, all three witnesses inside the vehicle, Ms, Poole, Ms. Love, and Ms. Taylor[,] who were present at the time of the shooting, positively identified [Hairston] as the individual who fired the gun at [Vadella] causing her death. And, there was sufficient evidence that [Hairston] possessed the firearm when he was prohibited from doing so.

Trial Court Opinion, 4/17/25, at 19-20.[3]

As summarized by the trial court, this was sufficient evidence for the jury to find that Hairston shot and killed Vadella. Hairston's contentions regarding Poole, Love, and Taylor's purported lack of credibility or unreliability due to intoxication was a matter for the jury to consider and goes to the weight of the evidence, not its sufficiency. **See Demulter**, 314 A.3d at 937.

Additionally, Hairston argues that the evidence that he discharged two rounds towards Vadella's vehicle, after her vehicle purportedly attempted to prevent Hairston from passing her, was not indicative of malice to sustain his conviction for third-degree murder but rather amounted only to a heat of passion mens reas. **See** Appellant's Brief, at 18-20. He argues that it is "unproven" whether he had any desire to strike Vadella or her vehicle but

_____

[3] This same evidence was also sufficient to establish that Hairston possessed and was in actual physical control of a firearm to sustain his convictions for person not to possess a firearm. The parties stipulated that Hairston was a person not to possess due to a prior disqualifying conviction. **See** N.T., 11/7/24, at 752.

- 8 -

rather merely discharged two rounds in her direction in a state of rage from Vadella attempting to obstruct him from passing her*. See id.* at 19-20.

> To convict a defendant of the offense of third degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but also a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (citations, brackets, and ellipses omitted). "[M]alice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (citation and internal quotation marks omitted). "[M]alice is inferred from the recklessness of the defendant's conduct." *Commonwealth v. Yard*, 323 A.3d 762, 765 n.4 (Pa. 2024) (citation omitted).

Hairston's argument is wholly without merit. Pennsylvania courts have repeatedly recognized that discharging a firearm in the direction of another person, even when the perpetrator did not intend to strike the victim, constitutes malice. *See Commonwealth v. Jones*, 271 A.3d 452, 460 (Pa. Super. 2021) ("Evidence that the defendant intentionally fired a gun directly at a person is sufficient to show malice.") (citations omitted); *see also Packer*, 168 A.3d at 169 ("The quintessential example of the level of

recklessness required to constitute malice is a defendant who shoots a gun into a crowd."). Accordingly, the Commonwealth did not have to prove that Hairston intended to strike Vadella or her vehicle. His malice was inferred from his reckless actions. ***See Yard***, 323 A.3d 762, 765 n.4. Shooting a gun twice towards the driver's area of a moving vehicle while driving alongside it clearly demonstrates a conscious disregard for an unjustified and extremely high risk of causing death or serious bodily injury to constitute malice.[4] Thus, Hairston's sufficiency challenge fails.

Hairston's second issue concerns the admission of evidence under Rule 404(b).

> With regard to the admission of evidence, we give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of the record.

***Commonwealth v. Lang***, 275 A.3d 1072, 1077-78 (Pa. Super. 2022) (citation omitted).

Under Pennsylvania Rule of Evidence 404, evidence of prior bad acts is generally inadmissible to show that a defendant acted in conformity with those

---

[4] Also, Hairston's claim that he was in a state of rage when he fired the shots is contradicted by the record. Poole, Love, and Taylor all testified that Hairston rolled down the passenger window, pulled out his gun, fired two shots towards Vadella's window, and never said anything before or after he did it. ***See*** N.T., 11/6/24, at 356, 430, 433, 459, 461.

- 10 -

past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). Such evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.* "[T]he term 'unfair prejudice' in Rule 404(b)(2) means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Gilliam*, 249 A.3d 257, 272 (Pa. Super. 2021) (citation and some internal quotation marks omitted). "When weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence." *Id.* (citation and brackets omitted).

As explained in the comment to Rule 404(b)(2) this list is "non-exhaustive." *See* Pa.R.E. 404(b)(2), comment. One such recognized exception to Rule 404(b) is proving a defendant's consciousness of guilt. *See Commonwealth v. Carter*, 320 A.3d 140, 148 (Pa. Super. 2024). Further, our Supreme Court "has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt." *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007) (citations omitted).

Hairston offers three primary arguments for why the trial court abused its discretion in admitting the evidence: (1) the message's probative value

was low because it was "at best, subject to interpretation and at worst, irrelevant[;]" (2) it did not fall under an applicable 404(b) exception; and (3) Poole testified that the post did not make her fearful. Appellant's Brief, at 28. Hairston's arguments are meritless.

First, as previously mentioned, attempting to influence a witness is admissible to prove the consciousness of guilt 404(b) exception. **See Rega**, 933 A.2d at 1009. Second, Hairston is mistaken that a threat must rise to the level of intimidation to demonstrate consciousness of guilt. Interfering with or attempting to influence a witness is enough. **See id.**; **see also Commonwealth v. Johnson**, 838 A 2d 663, 680 (Pa. 2003) ("[R]egardless of whether or not [the defendant's] statements constituted threats, it is apparent that they were intended to influence [the witness's] testimony at trial. Accordingly, they are relevant."). As the trial court explained, "the timing of it, the language that he used, there's an inference that can be drawn that [Hairston] somehow wanted [Poole] to be concerned, because, from his perspective, she was lying, making up a story to the police." N.T., 11/4/24, at 4. In other words, regardless of whether the Facebook post contained an actual threat against Poole, the trial court determined that, when considered in context, the post was an attempt by Hairston to interfere with or influence Poole's testimony, which demonstrated his consciousness of guilt. This gave the Facebook post and the phone call of Hairston directing Miller to make the post a high probative value. Further, any prejudicial impact was ameliorated by the trial court's jury instruction that the jury only could consider Hairston's

communication with Miller and the Facebook post as potential proof of Hairston's consciousness of guilt. *See* N.T., 11/7/24, at 735. Therefore, the trial court did not abuse its discretion.

Accordingly, for the reasons stated in this memorandum, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/10/2025